1999 SD 119

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Jack Sidney HAGAN, Defendant and Appellant.**

No. 20433.

Supreme Court of South Dakota.

Considered on Briefs Feb. 24, 1999.

Decided Sept. 1, 1999.

Mark Barnett, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, South Dakota, Attorneys for plaintiff and appellee.

Jack Sidney Hagan, Sioux Falls, South Dakota, Pro se for defendant and appellant.

PER CURIAM

[¶ 1.] Jack Hagan appeals convictions for one count of first-degree burglary, two counts of aggravated assault and three counts of kidnapping. We affirm.

FACTS

[¶ 2.] This case arises out of an incident in Black Hawk, South Dakota in November 1995. For reasons that are not clear in the record, Hagan suspected an individual named Pat Peschong had been involved in the theft of some of his property including some methamphetamine, cash and a motorcycle. On the evening of November 5, Hagan had his friend Lori Shoemaker phone Peschong and arrange to meet with him at his residence later that evening. After Shoemaker's call, Hagan went to Peschong's residence accompanied by Shoemaker and a third person named Ralph Bifulco. Both Hagan and Bifulco were carrying guns.

[¶ 3.] Peschong and his wife Shelly were at home when Hagan's group arrived. Shoemaker rang the doorbell to a door leading into the attached garage and Peschong went out to answer it. When Peschong opened the door, Hagan knocked him to the garage floor, wrapped a hand around his throat with one hand and held a gun to his chin with the other, all the while screaming obscenities at Peschong and accusing him of stealing his property. Then, Hagan drug Peschong into the dining room, holding him in a headlock and pointing his gun at Peschong's head. He allowed Peschong to calm his wife and then interrogated Peschong in the dining room while Bifulco held Peschong's wife captive in the master bedroom.

[¶ 4.] With Shoemaker standing by, Hagan pointed his gun at Peschong's forehead and threatened to kill him if he lied. Peschong cooperated and answered Hagan's questions about the missing property. Eventually, Shoemaker suggested they might have the wrong person and that an individual named Milt Bjornstad could be responsible. Hagan forced Peschong to phone Bjornstad to ask him to come over. After the call, Hagan and his cohorts hid themselves in Peschong's residence. When Bjornstad arrived, Peschong led him into the house to a seat at the dining room table. At that point, Hagan emerged from the darkened living room, gun in hand. Bjornstad reached for a knife and a short struggle followed, ending with Peschong's screams that they had his wife in the bedroom and would kill her if Bjornstad did not cooperate.

[¶ 5.] Hagan proceeded to interrogate Bjornstad about his missing property. When Hagan failed to get the answers he wanted he hit Bjornstad across the top of his head with his gun and Bjornstad began bleeding. At that point, Hagan or one of his associates taped Bjornstad's hands together with some duct tape and led him out to the garage where he was forced to lay on the floor on his belly. More duct tape was wrapped around Bjornstad's eyes and feet and Hagan held a knife to his throat, threatening to kill him. A short time later, Hagan placed Bjornstad in the passenger seat of Bjornstad's own vehicle, got into the driver's seat and drove away. Shoemaker and Bifulco followed in Shoemaker's car. Hagan later released Bjornstad who sought medical attention for the injury to his head.

[¶ 6.] The foregoing events were revealed during the course of a narcotics investigation in the Black Hawk area and Hagan was later charged with: one count of first degree burglary, three counts of kidnapping, three counts of aggravated assault and one count of possession of a controlled substance. Additionally, a part two habitual offender information was filed alleging Hagan had two prior felony convictions. Hagan's jury trial was in November 1997. Pursuant to various cooperative agreements and plea bargains, Linda Shoemaker, Ralph Bifulco, Patrick Peschong, Shelly Peschong and Milt Bjornstad all testified against Hagan. The jury returned verdicts finding Hagan guilty on all counts except the assault of Shelly Peschong and the possession of a controlled substance. Hagan was later adjudged a habitual offender and given sentences totaling three consecutive life terms. Hagan appeals.

## ISSUE 1

[¶ 7.] **Were Hagan's convictions obtained in violation of the 180 day rule?**

[¶ 8.] The 180 day rule requires a criminal defendant to be brought to trial within 180 days of his first appearance before a judicial officer on an indictment, information or complaint. SDCL 23A–44–5.1. Hagan's first appearance was on March 25, 1997 and his trial began 239 days later on November 19, 1997. Therefore, Hagan contends his convictions were obtained in violation of the 180 day rule and must be reversed.

[¶ 9.] Prior to expiration of the 180 days, the trial court granted the State's motion for a sixty-three day extension because of delay occasioned by Hagan's failure to promptly obtain the assistance of counsel. Hagan argues his failure to promptly obtain counsel caused no delay because he represented himself in the initial proceedings and the State could have proceeded against him directly without his being represented by counsel.

[¶ 10.] Hagan's claim of self-representation in the initial proceedings is baseless and contrary to the record. At no point in any of the trial court proceedings did Hagan ever assert his right to self-representation. While he did allow his first appearance on March 25 to proceed without counsel, it was only for the limited purpose of entering his not guilty pleas. During that same proceeding, Hagan actually *asserted* his right to counsel by advising the court he was trying to borrow money to hire Rapid City lawyer Randal Connelly to represent him. Given the uncertainty over Hagan's representation, the State requested a status hearing within two or three weeks to ascertain whether Hagan had retained an attorney and the trial court set the hearing for May 2, 1997.

[¶ 11.] Rather than clarifying the issue of Hagan's representation, the May 2 status hearing added to the confusion. While Hagan appeared at the hearing represented by attorney Timothy Rensch, Rensch made clear his appearance was limited to the status hearing only. He advised the court that Hagan was in a position to apply for court appointed counsel, but also advised that Hagan owned some motor vehicles he could sell to hire a lawyer. Rensch

further advised that the State had seized Hagan's vehicle titles during its investigation and had impeded Hagan's ability to sell his vehicles. Finally, Rensch mentioned that Hagan had been in contact with attorney Randal Connelly, but that Connelly had financial demands Hagan could only meet by selling his vehicles. The hearing ended with no resolution of the representation issue. Although Hagan filed an application for court appointed counsel, Rensch's comments made clear that Hagan wanted Connelly to represent him, that he was seeking Connelly's services and that he might eventually have the means to pay Connelly. Accordingly, the State requested another status hearing in two or three weeks to give Hagan time to get an attorney. The trial court set the next status hearing for May 27.

[¶ 12.] On May 16, 1997, attorney Rensch mailed the trial court a letter requesting Randal Connelly's appointment as defense counsel along with photocopies of titles to three vehicles establishing Hagan's ownership of property in the area. On May 19, 1997, the trial court entered its order denying Hagan court appointed counsel on the basis that the vehicle titles established Hagan was not indigent. Then, on May 27, 1997, the trial court signed an order appointing Timothy Rensch as defense counsel at Hagan's own expense.

■ [¶ 13.] "[A] defendant's request to represent himself must be unequivocal in nature." *State v. Chamley,* 1997 SD 107, ¶ 35, 568 N.W.2d 607, 618. Rather than establishing an unequivocal assertion of the right to self-representation, the above facts make clear that Hagan *never* sought to represent himself in this case. In fact, he continuously asserted his right to counsel by persisting with attempts to secure Randal Connelly's services until May 16, 1997. This posed a dilemma for the prosecution. On the one hand, Hagan was repeatedly asserting his right to counsel with claims he was seeking representation. On the other hand, the State could

not proceed with significant negotiations, discovery, motions or other preliminary matters because Hagan had no attorney to deal with. Hagan's contentions there was no reason the State could not deal with him directly on these matters are absurd in light of his repeated assertion of his right to counsel and settled law that the right to counsel extends to "every critical stage of a criminal proceeding[.]" *Loop v. Solem,* 398 N.W.2d 140, 141 (S.D.1986). *See also Massiah v. United States,* 377 U.S. 201, 205, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246, 250 (1964)(defendant entitled to aid of counsel from time of arraignment until the beginning of trial); *Kraft v. United States,* 238 F.2d 794, 799 (8thCir.1956)(defendant entitled to assistance of counsel at all stages of proceedings subsequent to indictment including those proceedings preliminary to trial); *Hanson v. Passer,* 13 F.3d 275, 278 (8thCir.1994)(defendant entitled to assistance of counsel at pretrial motions stage). Doubtless had the State proceeded directly against Hagan without counsel to assist him, as he now contends it should have, we would be confronted here with claims of violation of his Sixth Amendment right to counsel.

■ [¶ 14.] Based upon the foregoing, the trial court did not err in finding good cause for delay attributable to Hagan's failure to promptly secure counsel. *See State v. Bruch,* 1997 SD 74, ¶ 18, 565 N.W.2d 789, 793 (defendant has no right to manipulate his right to counsel in order to delay or disrupt the trial). However, we do find error in the trial court's exclusion of the entire sixty-three days between March 25 and May 27, 1997 from the 180 day computation. During the May 2, 1997 status hearing, attorney Rensch made clear that while Hagan might have some resources from which counsel could eventually be compensated, he lacked the ready resources necessary to retain counsel in time for the impending proceedings against him. In *State v. Dale,* 439 N.W.2d 112, 115 (S.D.1989), we defined indigence

to include the lack of financial resources allowing a defendant to retain counsel "at the particular time when one is needed." Thus, Rensch clearly established Hagan's indigence during the May 2 hearing and the trial court should have appointed counsel to represent Hagan at that time.[1] Since it did not, the trial court improperly considered the twenty-five days between May 2 and May 27, 1997 as delay attributable to Hagan. Thus, the trial court should have extended the 180 day period by only thirty-eight days (*i.e.*, 63 − 25 = 38) rather than the sixty-three day extension it did grant.

■ [¶ 15.] Even though the trial court erred in granting the State a sixty-three day extension rather than a thirty-eight day extension, Hagan's calculations in his brief fail to account for the time from filing until "final disposition" of his pretrial motions. This time is also to be excluded from computation of the 180 days. *See* SDCL 23A−44−5.1(4)(a). Hagan filed his first series of pretrial motions on August 13, 1997 and the trial court never entered a written order relative to these motions. Since motions are not "finally disposed" of until entry of a written order, *State v. Lowther*, 434 N.W.2d 747, 752 (S.D.1989), the entire time from August 13 until the beginning of trial on November 19 must also be excluded from computation of the 180 days.[2] This adds another ninety-eight days to the thirty-eight days of delay properly excluded by the trial court under its extension order. Thus the trial court could have properly excluded as many as 136 days (*i.e.*, 98 + 38 = 136) from the 180 day computation. Excluding 136 days from the 239 days it took to bring Hagan to trial means that Hagan was tried 103 days after his first appearance (*i.e.*, 239 − 136 = 103). There was no violation of the 180 day rule.

### ISSUE 2

[¶ 16.] **Did the trial court abuse its discretion in denying Hagan a continuance?**

[¶ 17.] Three months before trial, defense counsel filed an extensive discovery motion for prosecution disclosure of any of Hagan's prior statements. A hearing was held and the State agreed to provide such discovery thirty days before trial. Five days before trial, the State notified defense counsel of inculpatory statements made by Hagan to another jail inmate. Defense counsel promptly filed a motion in limine to prevent the introduction of these statements and also requested a continuance. Both motions were denied.

[¶ 18.] The day before trial, the State notified defense counsel of other inculpatory statements made by Hagan to a second jail inmate. Defense counsel made an oral motion in limine on the day of trial to prevent the introduction of these statements and this motion was also denied. Still later on the first day of trial, the State notified defense counsel of additional inculpatory statements made by Hagan to a third jail inmate. Once again defense counsel made a motion in limine to prevent the introduction of these statements and also moved for a continuance. Once again, both of counsel's motions were denied. As a result, all three inmates testified during the State's case in chief and relayed various inculpatory statements Hagan had made to them while he was in jail. Hagan now argues the trial court abused its discretion in denying his motions for a continuance as a remedy for the State's breach of discovery obligations.

---

1. The availability of property from which the county could eventually seek reimbursement for the costs of Hagan's court appointed counsel was an issue that could have been deferred to another time. *See e.g.* SDCL 23A−40−11 (lien created against personal property of defendant for whom county has provided legal counsel).

2. The burden of demanding written orders was on Hagan. *See State v. Sickler*, 334 N.W.2d 677, 679 (S.D.1983)(burden of demanding ruling rests upon party desiring it).

[¶ 19.] SDCL 23A–13–17 sets forth the remedies for breach of a discovery obligation. It provides in pertinent part:

If, at any time during the course of a proceeding, it is brought to the attention of a court that a party has failed to comply with an applicable discovery provision, the court may order such party to permit the discovery or inspection, *grant a continuance*, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. (emphasis added).

Under this provision, " '[t]he remedy for nondisclosure of discoverable material is left to the sound discretion of the trial court.' " *See State v. Hofman,* 1997 SD 51, ¶ 17, 562 N.W.2d 898, 903 (quoting *State v. Oster,* 495 N.W.2d 305, 309 (S.D.1993)). Thus, the trial court's choice of remedy or failure to grant a particular remedy is reviewed under an abuse of discretion standard. *See id.*

[¶ 20.] As Hagan contends, a statement given by the first inmate witness during an interview by the Division of Criminal Investigation (DCI) forty-three days before trial was not provided to defense counsel until five days before trial. Yet, counsel was given the name of the witness and a summary of his allegations almost two months before trial. At the same time, counsel was also given a copy of a handwritten letter from the witness in which he set forth most of the statements he later gave in his DCI interview. Despite this advance information, there is no indication in the record of any request or attempt by defense counsel to contact, interview or investigate the witness before trial. The record further shows that while a DCI agent did interview the witness forty-three days before trial, the prosecutors themselves did not receive a copy of his statement until five days before trial. That very same day, they faxed a copy of the statement to defense counsel.

[¶ 21.] Based upon the foregoing, we hold the trial court did not abuse its discretion in denying defense counsel's request for a continuance with regard to the first inmate witness. Defense counsel had advance notice of the witness and the substance of his testimony long before trial and failed to initiate any interview or investigation of the witness in the ample time available. In addition, there is no showing of bad faith delay by the prosecutors in the disclosure of the witness's statement.

[¶ 22.] Clearly there was no breach of discovery obligations warranting a continuance as to the two remaining inmate witnesses. Despite their agreement to disclose Hagan's prior statements thirty days before trial, it is obvious the prosecutors could not disclose any statements or witnesses they did not know about at that time. The record shows the prosecutors did not learn of the second inmate witness until two days before trial. At that point, they immediately attempted to notify defense counsel about the witness and actually communicated with counsel as soon as he returned their phone calls. Much the same is true as to the third inmate witness who did not even come forward until after opening statements on the first day of trial. Again, as soon as the prosecutors learned of the witness, they notified defense counsel of his existence and their intention to use him. At that juncture, the trial court even afforded counsel an opportunity to interview the witness outside of the prosecutors' presence. Absent some showing of prior knowledge by the prosecutors or a bad faith failure to disclose these witnesses, we hold there was no abuse of discretion in the denial of a continuance.

### ISSUE 3

[¶ 23.] **Did the prosecutor commit misconduct during closing argument?**

[¶ 24.] During closing argument, defense counsel commented:

And I say to you that you may not think that this case is a big deal today, and

I'm sure you do, but this case will affect you for the rest of your life, as it will affect Mr. Hagan for the rest of his, because in years down the road you can be slipping into bed at night and this case will pop into your mind and you know what you're going to think? You're going to think, "I leveled the playing field." You're going to feel good because you're going to enter acquittals on each and every one of these charges. You're going to know that you have done that which is just and right. You're going to know that you have made this system fair. You're going to know that you have done your duty.

In his rebuttal, the prosecutor stated:

If you want to lie in bed at night, as Mr. Rensch has indicated, and feel comfortable, lie in bed at night knowing you have found this man guilty so he's not going to come busting through your door—

[¶ 25.] After this comment, defense counsel objected and requested an opportunity to make a motion. Counsel's objection was overruled and no opportunity for further motions was given. Hagan argues the prosecutor's statement during closing argument constitutes misconduct and reversible error. As support for his contention, he relies on this Court's decision in *State v. Blaine*, 427 N.W.2d 113, 115 (S.D. 1988) that, "[a]rguments that invite ... jurors to put themselves in the shoes of a victim are generally improper."

[¶ 26.] While community conscience arguments are generally improper (*see State v. Stetter*, 513 N.W.2d 87, 90 (S.D.1994)), a prosecutor's closing argument "must be evaluated in light of the defense argument that preceded it[.]" *Darden v. Wainwright*, 477 U.S. 168, 179, 106 S.Ct. 2464, 2470, 91 L.Ed.2d 144, 156 (1986). Here, Hagan ignores it was his own defense counsel who first invoked community conscience by telling the jurors they should be able to go to bed at night knowing they leveled the playing field and did justice. Obviously the prosecutor's comment was a response to that statement.

[¶ 27.] In *Darden, supra*, the Supreme Court considered the following factors in determining that the prosecutors' closing argument did not deprive the defendant of a fair trial:

The prosecutors' argument did not manipulate or misstate the evidence,[3] nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent. Much of the objectionable content was invited by or was responsive to the opening summation of the defense ... [T]he idea of "invited response" is used not to excuse improper comments, but to determine their effect on the trial as a whole. The trial court instructed the jurors several times that their decision was to be made on the basis of the evidence alone, and that the arguments of counsel were not evidence. The weight of the evidence against petitioner was heavy; the "overwhelming eyewitness and circumstantial evidence to support a finding of guilt on all charges," reduced the likelihood that the jury's decision was influenced by argument ... "Darden's trial was not perfect—few are—but neither was it fundamentally unfair."

*Darden*, 477 U.S. at 181–83, 106 S.Ct. at 2471–72, 91 L.Ed.2d at 157–58 (citations omitted)(footnote added). Similar factors are present here. Doubtless the testimony of three victims, two co-conspirators and Hagan's own admissions did far more to seal his fate than a single abbreviated comment by the prosecutor during closing argument. As in *Darden*, the trial may not have been perfect, but it was fair and no reversible error can be predicated on the prosecutor's closing argument.

---

3. *Cf. Blaine, supra* where the prosecutor made arguments to the jury that were not based on the evidence and that asked the jury to consider what might have happened if a small child had crossed the DUI defendant's path.

**[¶ 28.] Did the prosecutor violate a pretrial order granting a motion in limine regarding evidence of Hagan's prior drug use?**

[¶ 29.] The trial court granted defense counsel's pretrial motion in limine to exclude, "comments, evidence, or argument of any sort, by the State, its agents and it's witnesses, directly or indirectly, about ... [a]ny prior drug use or dealings of Defendant Jack Hagan." During trial, Linda Shoemaker, one of Hagan's cohorts, testified for the State that the theft of methamphetamine from Hagan provided the impetus for his visit to the Peschong residence on the night of the incident. Shoemaker gave later testimony that, after arriving at the residence, Hagan accused Peschong of stealing his methamphetamine and told him he wanted it back. Finally, in response to a direct question by the prosecutor, Shoemaker testified that after leaving the Peschong residence on the night of the incident, Hagan approached another party to inquire about his stolen methamphetamine. Some of this testimony was objected to, some of it was not. However, no objections were raised that the testimony breached the scope of the order granting the motion in limine. Hagan now contends the testimony did violate that order.

[¶ 30.] The scope of the order on the motion in limine was discussed in some detail at a pretrial motions hearing and defense counsel himself noted its limitations as follows:

> MR. RENSCH: Well, I don't think it's fair for them in this case to get up and start talking about any drug use—possible drug use by Jack Hagan prior to this—*I mean, prior to the evening of this incident.* Getting into the fact that they may believe him to be a drug dealer or a drug user or—and all of that would have occurred beforehand. *I'm not talking about the specific night in question.* (emphasis added).

All of Shoemaker's references to Hagan's drug use were about his search for methamphetamine on the night of the incident. Clearly the testimony did not violate the order on the motion in limine as defense counsel himself interpreted it. Hagan's contrary contention is meritless.

[¶ 31.] Affirmed.

[¶ 32.] MILLER, Chief Justice, and SABERS, AMUNDSON, KONENKAMP, and GILBERTSON, Justices, participating.

