2000 SD 69

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Jerome Anthony BLEM, Defendant and Appellant.**

No. 21064.

Supreme Court of South Dakota.

Argued April 25, 2000.

Decided May 24, 2000.

804

Mark Barnett, Attorney General, Grant Gormley, Assistant Attorney General, Pierre, for plaintiff and appellee.

Michael J. Butler, Butler Law Office, P.C., Sioux Falls, for defendant and appellant.

SABERS, Justice.

[¶ 1.] Jerome Anthony Blem was convicted of first degree manslaughter for the death of David Drafahl at Blem's house in Frederick, South Dakota. He appeals. We reverse and remand for a new trial.

## FACTS

[¶ 2.] In March or April of 1998, Blem, age 40, hired Doug Krueger to clean a building. Blem testified that after two weeks, he paid Krueger $200, told him to leave and finished the job himself. Thereafter, Krueger admitted that he stopped by Blem's home, uninvited, approximately ten times to beg or "borrow" from Blem. Krueger also admitted to drinking whenever he had money. In late June, Krueger asked Blem for cigarettes. When Blem told him no, Krueger allegedly responded "don't make me have to go to Ellendale [North Dakota] to get some." Blem testified that he felt uneasy, but still refused to supply cigarettes to Krueger. However, from March to July 3, 1998, Blem gave Krueger an old washing machine, beer, canned goods, water and cigarettes.

[¶ 3.] Prior to July 3, Drafahl, Krueger's roommate, never accompanied Krueger on his visits to Blem's home. However, Blem knew Drafahl from the local bar. Blem testified that Drafahl told him that he was a Vietnam War veteran specially trained in the use of knives and machetes. Blem also testified that Drafahl was known to

carry a knife. He further testified that he knew of an earlier incident where police found three machetes, a lockblade knife, drugs and drug paraphernalia in Drafahl's vehicle.

[¶ 4.] Blem also knew that Drafahl was nicknamed "Machete Dave." Krueger testified that he started calling him that because "he always carried a machete when [they] were drunk" and he used it at work to "chop little twigs away from pieces of steel." However, the bar manager testified that Drafahl told him, in the summer of 1998, that he received his nickname because "he could sneak up behind me, cut me up into a hundred different pieces and no one would know."

[¶ 5.] On July 3, 1998, Krueger and Drafahl were drinking "quite a bit." When they ran out of beer, Krueger claims that they decided to walk to Blem's house to see whether he had beer. When the two arrived at Blem's house, at approximately 10:00 p.m., they noticed that Blem was on the phone. Krueger claims that he told Drafahl, "watch me scare him [Blem] ... just for a joke." Krueger opened the door and stated loudly "Hey, what's going on?" Blem, who was talking to his sister, Mary Brobjorg, over the telephone, was startled and jumped. He testified that he was even more frightened when he saw two people in and around his home. He told the men, "you are not invited," "you cannot be in my house," "get out of here," and "you have to go away." Krueger let the door shut and Mary heard the two men laughing "like hyenas." According to Krueger, Blem then emerged from a room with a .22 rifle telling Krueger "you ever do that again, I'll kill y[ou]." Blem then shot eight rounds over Krueger's head to "scare" them. Drafahl was standing up against the side of the house. After the shots were fired, Blem allegedly pointed the gun directly at Krueger who told Blem, "[y]ou better put that gun away before somebody gets hurt." As Krueger and Drafahl left Blem's property, they placed a string of firecrackers on a tree stump in Blem's front yard and positioned a lit cigarette over them so they would go off. Mary heard the men laughing and Blem told her that he "was scared" and was "being terrorized."

[¶ 6.] Mary tried to calm Blem down and stayed on the phone with him for approximately 90 minutes. Blem then went to the house of his friend, Bob Campbell, and told him about the incident and that the men "threatened him" and that he was afraid of them. Campbell testified that Blem was "frightened to death" and he checked on him the next day.

[¶ 7.] Blem also went to the bar that night to talk with Bryan Crawford about the incident. Crawford testified that Blem was upset and scared and he eventually got Blem calmed down. At one point in their conversation, Blem went outside to retrieve his pliers from his pickup. Crawford testified that when he returned, Blem told him that Krueger and Drafahl were hiding beside a building across the street and came "marching across the street toward him." Shortly after Blem re-entered the bar, Krueger and Drafahl entered and a few words were exchanged between Krueger and Blem.

[¶ 8.] Blem attempted to speak with deputy sheriff, John Heine, the next day, but was unsuccessful. He attempted again the next two days, but to no avail. When he finally contacted Heine, Heine told Blem that he could not shoot his gun off at people and that he could end up in more trouble than Krueger and Drafahl. Heine advised him that he could go to jail for 120 days and that he should talk with an attorney.

[¶ 9.] Blem spoke with an attorney and asked him to draft a restraining order. That attorney, however, could not assist him and referred him to another attorney.

[¶ 10.] On July 7, Blem borrowed a shotgun from a friend, Pete Lahr, to "deter" both Krueger and Drafahl. Lahr testified that Blem was scared of Krueger and Drafahl.

[¶ 11.] Around July 19, Blem spoke with the mayor of Frederick, Scott Campbell, about the problem he was having with Krueger and Drafahl. The mayor told Blem that there was nothing the city could do to help him and that he should contact the sheriff's office.

[¶ 12.] From July 3 to July 25, Blem saw both Krueger and Drafahl on numerous occasions, but never confronted either of them.

[¶ 13.] On July 25, 1998, Krueger and Drafahl were drinking heavily all day at Elm Lake and both were "pretty drunk." When they returned to Krueger's house between 8:30 and 9:00 p.m., Krueger went inside and Drafahl left on his bicycle.

[¶ 14.] Around 10:00 p.m., Blem heard a knock on his kitchen window, however, he could not see out. Blem heard a man call out, "it's the crazy mother f ... er" and "I'm here to getcha." The man walked around the house repeating those phrases and the phrase "lock and load, lock and load."

[¶ 15.] Blem testified that he was shaking and was scared. He ran to his bedroom and grabbed a revolver, a rifle and the phone to call 911. He put the revolver in his back pocket. Then, the door flew open, Drafahl stepped inside and Blem, startled, dropped the phone. Blem told him to get out of his house and fired one shot past Drafahl's shoulder to "scare him." Drafahl did not move. Blem slowly walked toward him and told him that the police were on their way. He held his gun with both hands and put it against Drafahl's chest "to try and back him out." Blem testified that Drafahl was pushing toward him and he was pushing back. Blem got him out the door and was attempting to push him toward the street. As Blem was pushing him, Drafahl repeatedly reached into a side pocket in the Army fatigues he was wearing. Then Drafahl allegedly announced, "that's it, we go no further, you die now" and "I'm gonna kill you." Drafahl reached into his pocket again and Blem held up his pistol and shot into the air. Blem told Drafahl to "get the f.. k out of here." Drafahl allegedly lunged at Blem with his hands towards Blem's throat and Blem shot Drafahl with the pistol. Drafahl continued to come toward him. Blem backed up and began to fire his rifle. He shot Drafahl until he "felt safe." Blem later phoned the police and reported the shooting.

[¶ 16.] As it turned out, Drafahl was not armed. He was shot five times: in the back, the right hand, back of the right side of the neck, and two times on the left side of the head. Blem was indicted for second-degree murder and first-degree manslaughter. The case was tried April 15 through 26, 1999 and Blem claimed that he acted in self-defense. A jury found Blem guilty of first-degree manslaughter and he was sentenced to serve fifty-five years in the state penitentiary.

[¶ 17.] Blem appeals raising four issues.

[¶ 18.] **1. WHETHER THE TRIAL COURT ERRED IN REMOVING TWO PROSPECTIVE JURORS FOR CAUSE PRIOR TO COMMENCEMENT OF THE STATUTORY JURY SELECTION PROCESS.**

[¶ 19.] Before voir dire commenced, the State sent a letter, dated December 22, 1998, to the trial court requesting that it remove two potential jurors, Scott Weller and Miles Bretsch, for cause. A copy of this letter was sent to Blem's attorney. Blem's attorney responded by letter, dated December 29, 1998, to the trial court indicating that he strongly opposed the proposed removal of these two potential jurors. A copy of this letter was sent to the State. At a motions hearing on January 5, 1999, the parties argued the removal of these two potential jurors to the trial court. Weller had signed a petition that was circulated in Frederick to show support for Blem and to demonstrate that the community did not fear Blem's residing in Frederick while he was on bond. Bretsch did not sign the petition, but attended

Blem's arraignment on September 1, 1998. The State argued that Bretsch received detailed information about the trial and that Blem's attorney told the court that he might call Bretsch as a witness. During this hearing, the State also asserted: "I'd like to see any citation that a court cannot excuse jurors before reporting for duty, you show me one. And if that's the law then we are violating it." Blem contested the removals, but the trial court granted the State's motion.

[¶ 20.] On appeal, Blem argues that the statutory jury selection process was violated and he was denied an opportunity to determine that these prospective jurors were not biased and should not be removed for cause. He counters the State's claim that his attorney told the trial court during arraignment that Bretsch might be called as a witness.[1]

[¶ 21.] The rules of statutory interpretation are well established:

The purpose of statutory construction is to discover the true intention of the law which is to be ascertained primarily from the language expressed in the statute. The intent of a statute is determined from what the legislature said, rather than what the courts think it should have said, and the court must confine itself to the language used. Words and phrases in a statute must be given their plain meaning and effect. When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed. Since statutes must be construed according to their intent, the intent must be determined from the statute as a whole, as well as enactments relating to the same subject. But, in construing statutes together it is presumed that the legislature did not inten[d] an absurd or unreasonable result.

*Edgemont School District 23–1 v. SD Dep't of Revenue*, 1999 SD 48, ¶ 8, 593 N.W.2d 36, 38–39 (quoting *Dahn v. Trownsell*, 1998 SD 36, ¶ 14, 576 N.W.2d 535, 539 (citations omitted)). Questions of law, including statutory construction, are reviewed under a de novo standard, giving no deference to the trial court. *Engelhart v. Kramer*, 1997 SD 124, ¶ 8, 570 N.W.2d 550, 552 (citing *West Two Rivers Ranch v. Pennington County*, 1996 SD 70, ¶ 6, 549 N.W.2d 683, 685).

[¶ 22.] SDCL 23A–20–6 provides:

The defense attorney ... and the prosecuting attorney *shall conduct examination of prospective jurors.* Prior to the examination, the court may conduct a general examination of the prospective jurors. The court may in its discretion allow examination of one or more jurors apart from the other jurors.

(emphasis added). The statutory language unequivocally provides that an examination of prospective jurors "shall" take place. The State asserts, however, that this statute conflicts with the initial language of SDCL 23A–20–8:

*At any time that cause for disqualifying a juror appears,* the court shall excuse him and call another member of the panel to take his place in the jury box and on the clerk's list of jurors. Challenges for cause may be made out of hearing of the jurors, but shall be made on the record.

(emphasis added).

[¶ 23.] A careful review of both statutes leads to the conclusion that they do not conflict. SDCL 23A–20–8 means that once the juror is excused for cause, the court shall then "call another member of the panel to take his place in the jury box[.]" It is clear that the intention is that the trial court can remove a juror for cause at any time *during the examination.* The State misreads the language in SDCL 23A–20–8. Therefore, an examination

---

1. The State's claim that Blem's attorney told the trial court that Bretsch may be called as a witness at Blem's trial appears to be a misstatement of the record.

must be conducted in order to remove a juror for cause under SDCL 23A–20–6.

[¶ 24.] The removal of these two jurors for cause was error. The statute in effect at the time of trial (SDCL 23A–20–12) provided that a juror may be excused for cause only on actual or implied bias.[2] Actual bias is defined as "the existence of a state of mind on the part of a juror, in reference to the case or to either party, which satisfies the court ... that he cannot try the issue impartially...." SDCL 23A–20–12. In order to remove a juror for implied bias, "one or more of the causes stated in § 23A–20–13 must be alleged." *Id.*

[¶ 25.] Here, an *examination* of the jurors never took place. The excused jurors did not have an opportunity to express their state of minds; therefore, actual bias could not be determined. Additionally, none of the causes set forth in SDCL 23A–20–13 to establish implied bias have been satisfied. *See First Bank of SD v. VonEye*, 425 N.W.2d 630, 633 (S.D. 1988) (quoting *State v. Hansen*, 407 N.W.2d 217, 220 (S.D.1987) (stating a "mere expression of a predetermined opinion ... does not disqualify a juror per se.")); *State v. Flack*, 77 S.D. 176, 89 N.W.2d 30, 32 (1958) (stating that "qualifications of a juror must be determined from the whole voir dire *examination.*") (emphasis added). Thus, the removal of these two jurors, prior to the voir dire process, was error. Because there was no examination, there was no substantial compliance with these statutes.

[¶ 26.] The State argues that if there is error, it was harmless error because Blem failed to prove that the jury was unfair or impartial. Blem counters by arguing that the harmless error analysis is not applicable because the trial court committed reversible error in failing to follow statutory procedures. Blem claims that a failure to substantially comply with statutory proce-

dures governing jury selection is a structural error not subject to harmless error review.

[¶ 27.] In *State v. LaMere*, 2000 Mont. 45, 2 P.3d 204, the Montana Supreme Court recently addressed the issue of whether the failure to abide by the statutory provisions of jury selection violated the defendant's constitutional right to a fair and impartial jury. In *LaMere*, the clerk of court used a computerized random selection to draw 200 names from the list of eligible jurors within the county. She then telephoned 101 potential jurors and ordered them to appear for jury duty the next day. The defendant objected and argued that the use of the telephone did not substantially comply with Montana statutes requiring that potential jurors be served either by mail or by the sheriff.

[¶ 28.] The *LaMere* court overruled a prior decision, *State v. Robbins*, 292 Mont. 23, 971 P.2d 359 (1998), which had held that harmless error analysis was applicable to statutory violations of the jury selection statutes. The *LaMere* court determined that jury selection statutes existed "to secure rights deemed fundamental to our system of justice by minimizing and, indeed, preempting the violation of such fundamental rights from the outset of a trial." *LaMere*, 2 P.3d at 211. Because the right to an impartial jury is fundamental, the court returned to an automatic rule of reversal for "a material failure to substantially comply with Montana statutes governing the procurement of a trial jury" for four reasons:

(1) such an error precedes the presentation of any evidence to the jury, and cannot be analyzed as mere trial error without resorting to speculation;

(2) such an error, because it precedes the trial process, cannot be quantita-

---

2.  SDCL 23A–20–12 was repealed July 1, 1999 and was replaced with SDCL 23A–20–13.1 which enumerates twenty-one circumstances in which a challenge for cause may be sus-

tained. However, even under this new statute, an examination of these two jurors was required.

tively assessed for its prejudicial impact relative to the evidence introduced at trial;

(3) such an error, being other than an error in the trial process, affects the very framework within which the trial proceeds; and

(4) the impartiality of the jury goes to the very integrity of our justice system, and the right to an impartial jury is so essential to our conception of a fair trial that its violation cannot be considered harmless error.

*Id.* at 217.

■ [¶ 29.] We are persuaded by the *LaMere* rationale and determine that the South Dakota statutory procedures "establish objective methods for the random selection of trial jurors" in South Dakota. "These objective procedures, by seeking to eliminate as far as possible the vagaries of human subjectivity and arbitrariness from the jury selection process, secure a defendant's fundamental right to an impartial jury...." *Id.* at 214. Therefore, a substantial failure to comply with jury selection statutes is a structural error because it "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* at 216 (quoting *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302, 331 (1991)). *See also People v. Gratz,* 35 Mich.App. 42, 192 N.W.2d 304, 305 (1971) (holding that "a failure to comply with the statutory provisions concerning the selection of juries may not be rectified under [the harmless error] statutory provision"); *People v. Miller,* 411 Mich. 321, 307 N.W.2d 335, 337 (1981) (holding that a defendant need not establish that he was prejudiced by the jury selection when the statutory provisions are not complied with).

■ [¶ 30.] Here, there was a substantial failure to comply with jury selection statutes because no examination of the prospective jurors was conducted prior to their removal. Blem was denied an opportunity to demonstrate that neither of these jurors were biased nor prejudiced. It is true that a party is entitled to an impartial jury, but not to a particular juror. This concept is generally applied to the defendant but is also true for the State. Neither side, including the State, is entitled to the exclusion of particular jurors prior to the commencement of the voir dire process.

[¶ 31.] We reverse and remand for trial.

[¶ 32.] **2. WHETHER THE TRIAL COURT ERRED IN PERMITTING THE STATE TO PRESENT EXPERT WITNESS TESTIMONY ON BLOOD SPATTER ANALYSIS WITHOUT PRIOR NOTICE TO BLEM.**

■ [¶ 33.] Bob Schuchardt is a special agent with the Department of Criminal Investigation (DCI). He participated in this criminal investigation and the State disclosed to Blem that it planned to call him as a witness:

He will testify as to any photographs taken by him for foundational purposes. He will testify as to any samples of any evidence taken by him. Agent Schuchardt also participated in the interview of the Defendant and will testify as to the statements made by the Defendant.

[¶ 34.] During the trial, Schuchardt testified that he was involved with law enforcement since he graduated from high school. In 1992, he attended a one-week course in Pierre on blood spatter analysis. The State asked Schuchardt whether he made any conclusions about the blood spatters in this case. Blem objected, but the trial court allowed Schuchardt to testify. Schuchardt testified to the position of the bicycle when Drafahl's blood dropped on it. He also testified that the blood droplets on the ground came from a source that was "moving very slowly."

[¶ 35.] The next morning, Blem made a motion for a mistrial because, despite his discovery requests, he received no prior notice in any form, oral or written, that

Schuchardt would testify as an expert on blood spatter analysis. During an in-chambers hearing on the motion for a mistrial, the State claimed that Schuchardt's conclusions were reported to them only the day before he testified. The State also claimed that it did not think it should have to "interview Mr. Schuchardt and find out answers for the defense in advance."

[¶ 36.] Blem's attorney called Schuchardt as a witness in support of his motion for a mistrial. Schuchardt testified that he had sent photographs and "an outline of what [his] opinions were and what [he] may be testifying to" to a laboratory in Wyoming for confirmation of his opinion on March 30. He further stated that he discussed his blood spatter opinions with the prosecuting attorney prior to March 30. Despite that, the trial court denied Blem's motion for a mistrial.

[¶ 37.] Blem argues that the trial court erred in failing to sustain his objection to Schuchardt's testimony and failing to grant his motion for mistrial because he had no prior notice of Schuchardt's expert opinion. Additionally, he argues that Schuchardt's qualifications as an expert are "doubtful at best" when reviewed under the *Daubert* standard.

[¶ 38.] First, the State argues that Blem failed to preserve the issue for appeal because he (1) did not make immediate objections to Schuchardt's testimony, (2) did not ask for a continuing objection or for an immediate mistrial, and (3) did not ask for a *Daubert* hearing. We disagree. The record indicates that Blem's attorney objected and preserved the issue for appeal.

[¶ 39.] Second, the State argues that it was aware of Schuchardt's testimony only a couple of days prior to his being called as a witness; therefore, it claims it did not violate the discovery order nor did it fail to provide a copy of Schuchardt's report to Blem, because a report did not exist. We disagree.

[¶ 40.] Once an expert opinion is known to the State and the State determines that it will solicit that opinion in court, it must disclose the opinion to the defense regardless of the number of days or hours before the witness is scheduled to testify. SDCL 23A–13–15 provides:

> If, *prior to or during trial,* a party discovers additional evidence or material previously requested or ordered, which is subject to discovery or inspection under §§ 23A–13–1 to 23A–13–14, inclusive, *he shall promptly notify the other party or his attorney* or the court of the existence of the additional evidence or material.

(emphasis added). *See also State v. Hagan,* 1999 SD 119, ¶¶ 20–22, 600 N.W.2d 561, 566 (determining that a discovery order was not violated when the State, *upon its receipt,* disclosed a witness statement to the defendant five days before trial). Parties are not granted immunity from discovery orders merely because the trial has commenced. Furthermore, the State's position that it knew of Schuchardt's opinion only days before his testimony is contradicted by Schuchardt's testimony. Schuchardt testified that he rendered his opinions before March 30 and had discussed them with the State's attorney. The trial did not commence until April 15.

[¶ 41.] It clearly was error for the State to withhold the substance of Schuchardt's testimony from Blem. In view of our determination of reversible error on Issues 1 and 4, it is not necessary to reach or determine the extent of the prejudice sustained by Blem as a result thereof.

[¶ 42.] **3. WHETHER THE TRIAL COURT ERRED IN RULING THAT CERTAIN PORTIONS OF WITNESS TESTIMONY WAS EXCLUDED.**

*A. Bryan Crawford*

[¶ 43.] The State's strategy throughout the trial was to portray Drafahl as a nonviolent man with a peaceful reputation. During its case-in-chief, the State called Bryan Crawford as a witness.

Prior to trial, Crawford made a statement reflecting that he felt that Drafahl did not have a reputation for violence. At trial, he vacillated and testified that prior to July 3, Drafahl *did* have a reputation for violence. The State used a portion of his statement to refresh Crawford's recollection. After reading his statement, Crawford simply explained that when he gave his prior statement, he had forgotten an incident which had occurred prior to July 3.

[¶ 44.] In chambers, Blem requested permission to admit the complete page of the statement used to refresh Crawford's memory during cross-examination. He argued that the complete page would explain the inconsistency in Crawford's testimony. The critical portion of the testimony provided: "David was – would talk about killing people. That he ... killed in fifty different ways...." The trial court refused to allow Blem to offer the page into evidence or to question Crawford about it. It further instructed that Blem could only ask Crawford whether Drafahl had a reputation for violence.

[¶ 45.] Blem argues that the trial court committed reversible error in restricting his cross-examination of Crawford. He argues that under SDCL 19–12–6, on cross-examination, inquiry is allowed into relevant specific instances of conduct when proof of character or reputation is offered by a party. He also contends that the State "opened the door" and placed Drafahl's good character into issue; therefore, any inquiry into the victim's bad character is relevant and admissible.

[¶ 46.] Under SDCL 19–12–4(2), evidence of the victim's character or a trait of his character is admissible to show he acted in conformity therewith "to rebut evidence that the victim was the first aggressor." Generally, this "pertinent trait of character" is proven by testimony of the victim's reputation. *Id. See State v. Latham,* 519 N.W.2d 68, 71 (S.D.1994) (citations omitted).

[¶ 47.] The State's strategy was to portray Drafahl as a nonviolent man, apparently in an effort to prove that he was not the aggressor. Thus, under SDCL 19–12–4(2), the State could present testimony concerning Drafahl's reputation as a peaceful man. It could also ask Crawford whether David Drafahl had a reputation for violence prior to July 3. Unexpectedly, Crawford replied, "Yes, he did." The State attempted to impeach him with a portion of his prior statement. Blem wanted Crawford to explain to the jury why his testimony was not inconsistent; that is, that Drafahl would talk about killing people and that he had "killed in fifty different ways."

[¶ 48.] SDCL 19–12–6 provides:

In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. *On cross-examination, inquiry is allowable into relevant specific instances of conduct.*

(emphasis added). This statute plainly allows cross-examination into specific instances of conduct when "a trait of character" is admissible.[3] Therefore, the trial court clearly erred. Under the circumstances, this testimony is admissible, if necessary, for impeachment purposes on re-trial.

There is no showing that Blem knew that Drafahl talked about killing people or that he had killed in fifty different ways. Therefore, the trial court did not err in this respect in excluding the evidence, but the specific instances were clearly admissible to impeach any testimony that Drafahl was a peaceful person.

---

3. The rule differs where the testimony is offered for substantive purposes rather than for impeachment. For example, relevant specific instances of conduct are limited to those incidents known to a person claiming self-defense at the time of the killing. *State v. Knecht,* 1997 SD 53, ¶ 15, 563 N.W.2d 413, 419; *Latham,* 519 N.W.2d at 71; *State v. Dokken,* 385 N.W.2d 493, 501 (S.D.1986).

## B. Robbin Hruska

[¶ 49.] During the summer of 1998, Hruska was helping his sister operate the bar in Frederick. He told the jury that prior to July 3, 1998, Drafahl told him his nickname was "Machete Dave" because "he could sneak up behind [Hruska], cut [him] up into a hundred different pieces and no one would know."

[¶ 50.] The trial court allowed this testimony but ruled that Hruska could not testify to the conversation concerning Drafahl's scheme as follows: Drafahl asked Hruska to sign a piece of paper which provided that the bar was a public place. If Hruska would sign it, Drafahl explained that he could shoot Hruska and sue the city. Then the two could split the money. At that point, Hruska told Drafahl to leave the bar and Drafahl started pounding the bar with his first.

[¶ 51.] Blem argues this evidence was admissible under SDCL 19–12–7 because the State made the victim's reputation an issue. He claims that proof of Drafahl's violent nature, particularly when drinking, was relevant to Blem's claim of self-defense to rebut the State's portrayal of Drafahl's peaceful reputation.

[¶ 52.] As indicated above, Blem was entitled to present relevant specific instances of conduct to impeach the State's evidence that Drafahl was a peaceful person. The trial court erred. On re-trial, this evidence is admissible, if necessary, for impeachment purposes.

## C. Mary Brobjorg, Blem's sister

[¶ 53.] Blem was having a telephone conversation with his sister, Mary, on July 3, 1998, the night Krueger burst into his home. She remained on the phone and heard what transpired between the two parties. She testified that she asked Blem why he was scared. At that point, the State objected to Mary's anticipated response on the grounds of hearsay.

[¶ 54.] During Blem's offer of proof, Mary told the trial court that Blem told her that the men were "threatening him," and "terrorizing him." When she asked him "are you being intimidated," he replied "no, I am being terrorized." She described Blem as "panicky," "scared" and "breathing heavy." The trial court allowed her to testify that Blem told her that two "bad dudes came in his house," but determined that the rest of her testimony was inadmissible because it was "unrelated to the event."

[¶ 55.] Blem argues that his response of "being terrorized" showed his fear of Krueger and Drafahl and was an excited utterance or a contemporaneous statement. Therefore, he claims that the statement was admissible under both SDCL 19–16–5 and 19–16–6. He also claims that the statement does not amount to hearsay under SDCL 19–16–2 because the declarant, Blem, testified, in court under oath, before Mary testified.

[¶ 56.] To be admissible evidence under the excited utterance rule, the statement must (1) relate to a "startling event or condition;" and (2) be made by the declarant while "under the stress of excitement caused by the event or condition." SDCL 19–16–6. Similarly, a statement is considered to be contemporaneously made and admissible if it describes or explains "an event or condition" and is "made while the declarant was perceiving the event or condition, or immediately thereafter." SDCL 19–16–5.

[¶ 57.] Here, Mary possessed firsthand knowledge of what occurred that night. After Krueger and Drafahl left, Blem got back on the phone and was "panicky," "scared" and "breathing heavy." He told Mary that he was scared and that he was "being terrorized." This statement is an excited utterance because it relates to the startling event of a man bursting into his home. This statement describes the condition of being "terrorized" and was made while Blem was perceiving the event, or immediately thereafter, therefore it was

contemporaneously made. Thus, it was error to exclude this testimony.

[¶ 58.] The State argues that the response is not a contemporaneous statement or an excited utterance because it is not a statement of fact and merely describes the history between the two parties. The application of the excited utterance or contemporaneous statement rules is not limited to ones of fact. *See Lee v. Solem*, 405 N.W.2d 56, 58 (S.D.1987) (stating that the testimony that $1,500 had to be taken to petitioner's home "or else someone would be floating in the river" may be admitted as an excited utterance); *State v. Wolford*, 318 N.W.2d 7, 10–11 (S.D.1982) (determining that the following statement was properly admitted as a contemporaneous statement: "That ___ ___ stole a car. I am going to stay the hell away ___." (expletives omitted)). Therefore, we conclude that the trial court erred in excluding portions of Mary's testimony.

[¶ 59.] The State further claims that error, if any, was harmless because Mary testified that Blem was "scared" and any reference to Blem's "being terrorized" is merely cumulative. When the basis for claiming harmless error is that the evidence is cumulative, a court's inquiry must go beyond whether duplicative evidence exists:

> A court's inquiry as to harmlessness does not end with its determination that the erroneously admitted evidence duplicates the untainted evidence. Regardless of the duplicative nature of the erroneously admitted evidence, the record in the particular case might reveal that the admission of the evidence was or was not prejudicial. In some cases the jury may not have been persuaded of the defendant's guilt had it not been presented with the erroneously admitted duplicative evidence. Conversely, in other cases although the erroneously admitted evidence is not duplicative, it

could be clear to the court that the evidence had no impact on the conviction.

*State v. Younger*, 453 N.W.2d 834, 842 (S.D.1990) (Sabers, J., concurring specially) (quoting *State v. Billings*, 110 Wis.2d 661, 329 N.W.2d 192, 196 (1983)). In other words, the focus should be on the extent of the prejudice caused by the error, even if duplicative. However, because of our determination of reversible error on Issues 1 and 4, we need not reach this question. Once again, on retrial, this evidence should be admitted.

[¶ 60.] **4. WHETHER THE TRIAL COURT ERRED IN PERMITTING THE STATE TO CROSS-EXAMINE BLEM ON HIS MENTAL ILLNESS AFTER GRANTING THE STATE'S MOTION IN LIMINE PROHIBITING THAT EVIDENCE.**

[¶ 61.] Blem suffers from bipolar disorder.[4] On November 24, 1998, the State made a motion in limine to prohibit the defense from "presenting any testimony or argument that [Blem] by virtue of his peculiar characteristics or sensibilities acted reasonably in killing [Drafahl]." The trial court granted the State's motion stating that "the standard from which the Defendant's conduct is to be judged is a reasonable person ... standard[.]"

[¶ 62.] At trial, the defense complied with the ruling and offered no testimony or evidence of Blem's mental illness. However, the State questioned Blem about his mental illness during cross-examination. Despite the motion in limine and Blem's objections, the State elicited information about the type of illness he suffered, the type of medications he was taking, the affect his medications had on his ability to perceive events and whether the disorder or the medications caused "violent mood swings." Blem's attorney was

---

4. Bipolar disorder is a form of manic depression. Lawyers' Medical Cyclopedia, § 17.16 (4th ed. 1996). A patient with bipolar disorder experiences different phases of depression throughout the illness. *Id.*

granted a continuing objection to this line of questioning.

[¶ 63.] During an in-chambers hearing, the State argued that his inquiries were permissible because Blem repeatedly testified that he was "afraid, afraid, afraid, afraid." The State declared that it was "entitled, for impeachment purposes, . . . [to inquire] whether or not his fears [were] exaggerated because of his mental illness." The trial court allowed the State to proceed.

[¶ 64.] During closing arguments, the State further argued to the jury that Blem was not a credible witness "because of [his] psychological makeup, [he] exaggerates and embellishes and, as I said, has different moods, violent moods, meaning violent in the sense I'm using extreme." Blem objected because he testified that he did *not* experience violent mood swings. The trial court noted his objection and the State continued arguing that Blem had a "sick and exaggerated mind [and][h]is beliefs are unreasonable about any risk." He further stated:

> [I]f we allow the Jerry Blem's of this world, the people who are easily frightened, the high strung, the prone to exaggeration to have a license to kill because they believe that they were in danger, then many people, then the mentally ill, the cowards of the world are given . . . a license to kill[.]

> \* \* \*

> We have to impose upon these people rationality or we're all going to be at risk for the – for the violent conduct of irrational, unreasonable people if the defense is, well, they thought it was ok so its ok. . . .

> \* \* \*

> [Blem] recounted events in his mind that did not happen and exaggerated them, embellished them and worked himself up. A fear probably created by his psychological makeup. His personality.

[¶ 65.] Blem argues that it was reversible error to allow the State to question Blem about his mental illness in direct violation of the State's motion in limine. He claims that it was also reversible error to allow the State, in its closing argument, to argue that his bipolar disorder affected his judgment. He claims that this evidence should have been excluded under Rule 404(b) because it was highly prejudicial and with little probative value and requests that this court reverse on the basis of plain error.

[¶ 66.] The State claims that self-defense is judged by an objective reasonable person standard. Because Blem testified that he was afraid, which is a personal and subjective emotion, the State argues that it had to use Blem's mental illness to show that the subjective evidence of Blem being "afraid" was not objectively reasonable.

[¶ 67.] "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court." SDCL 23A–44–15. In *State v. Nelson*, 1998 SD 124, ¶ 8, 587 N.W.2d 439, 443, we explained:

> Plain error requires (1) error, (2) that is plain, (3) affecting substantial rights; and only then may we exercise our discretion to notice the error if (4) it 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings. We invoke our discretion under the plain error rule cautiously and only in "exceptional circumstances."

(alteration in original) (internal citations omitted). Under plain error analysis, Blem bears the burden of proving that the error was prejudicial and must be corrected because "a miscarriage of justice would otherwise result." *Id.* (citations omitted).

[¶ 68.] Here, the State, in its brief in support of its motion in limine, argued that if Blem were allowed to present evidence concerning his "peculiar characteristics or sensibilities:"

> One would expect that various witnesses including a psychologist or counselor

would be expected to testify that at least as to this Defendant and because of his peculiar sensibilities and mental illness he perceives danger differently; and, would respond differently th[a]n the average reasonable person. If that is to be the law, then the South Dakota Supreme Court should overrule their prior decisions and make the same clear. The present authority does not allow for this Court to allow for a 'peculiar' standard based upon peculiar sensibilities of every individual. The reasonable objective person is still the standard in the State of South Dakota.

[¶ 69.] Clearly, the State, during the pretrial motions, argued that Blem was to abide by the objectively reasonable person standard and was prohibited from presenting evidence on his mental illness. During the trial, Blem testified that he was "afraid," an emotion that the jury was ultimately instructed to evaluate under the objectively reasonable person standard. *See* Instructions 19, 28. However, the State determined it necessary to explain that Blem was "unnecessarily afraid" because of his mental illness, thereby requesting the jury to use a subjective standard. The State can not have it both ways. Blem was denied an opportunity to present expert testimony and evidence concerning the nature of his mental illness, the extent of Blem's mental illness at the time of the shooting; that is, whether he suffered from a manic episode and how his perceptions are affected, if at all. Essentially, Blem was ambushed by the State and denied his right to a fair trial. We conclude that the State's violation of its motion in limine and its conduct during closing argument constitutes prejudicial error resulting in an unfair trial.

[¶ 70.] In summary, we conclude that the trial court erred on all four issues. The errors in Issues 1 and 4 were clearly prejudicial. Whether the errors in Issues 2 and 3 were sufficiently prejudicial by themselves to warrant reversal we need not decide as the entire case must be retried in any event. We reverse all issues.

[¶ 71.] MILLER, Chief Justice, and AMUNDSON, KONENKAMP and GILBERTSON, Justices, concur.