2002 SD 42

**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Lavance OWENS, Defendant and Appellant.**

No. 21583.

Supreme Court of South Dakota.

Argued Aug. 29, 2001.

Decided April 10, 2002.

Mark Barnett, Attorney General, Frank Geaghan, Assistant Attorney General, Pierre, for plaintiff and appellee.

Jeff Larson, Nichole Carper, Minnehaha County Public, Defender's Office, Sioux Falls, for defendant and appellant.

ZINTER, Circuit Judge.

[¶ 1.] Lavance Owens (Owens) appeals from his conviction of the murder of Marvene Ross (Ross). We affirm.

## FACTS AND PROCEDURAL HISTORY

[¶ 2.] On September 2, 1999, Owens came home from work around 4:00 p.m. He shared the home with his girlfriend, Amber Poppenga (Poppenga) and their child. Charles Tillman (Tillman), Carrie Tschetter (Tschetter), and Tschetter's two children also resided in this home.

[¶ 3.] Shortly after Owens arrived, Owens and Tillman left to purchase cigarettes for Poppenga. The men did not, however, come directly home. Instead, they went to a bar. Tillman believed both men were intoxicated when they finally returned around 2:00 a.m. on September 3.

[¶ 4.] When they arrived, an argument broke out between Owens and Poppenga. Poppenga testified that Owens struck her in the face and back. Owens also put his arm around her neck and put his hands on her mouth. Owens opened Poppenga's mouth in a way that she could not scream

or make any noise. Moreover, while this assault was taking place, Owens told Poppenga to "shut up"; he threatened that if she "wasn't quiet, he was going to hurt [her] worse than what he was doing." Poppenga ultimately blacked out.

[¶ 5.] When Poppenga regained consciousness, she told Tschetter and Tillman what had occurred. Tillman testified that the right side of Poppenga's face, eye and lip were swollen, and the white of her eye was purple and red. Tillman and Owens then began to argue. Tillman asked Owens to leave. When Owens refused, a fight broke out between the two, and Tschetter left to call the police. Tillman again asked Owens to leave, but he refused. The fighting continued, and Owens ultimately left the home running as the police pulled into the driveway. Owens was not apprehended, and he did not return to the home until approximately 9:00 a.m. that morning of September 3.

[¶ 6.] Shortly after he returned around 9:00 a.m., Owens was detained for his assault on Poppenga. Owens agreed to go to the police station for questioning. He was subsequently arrested for the assault. During the booking process, Owens' personal property was inventoried. Two rings were recovered from Owens' pocket. These rings were later determined to belong to the decedent Ross.

[¶ 7.] Earlier that morning of September 3, at 5:30 a.m., Ross' body was discovered near some railroad tracks.[1] A police officer testified that her body was found in a location under weeds where it was hard to see. It appeared that Ross' body was intentionally placed there to be out of view. The body was nude from the waist down.

[¶ 8.] The coroner, Dr. Randall, discovered large rocks inside Ross' mouth. Dr. Randall testified that the cause of Ross' death was either "obstruction of the air-

way from foreign objects being placed in the mouth or from obstruction from the neck, the voice box, in either an asphixial or strangulation process from injury to the neck, or both." Dr. Randall estimated that the time of death was between 4:00 a.m. and 8:00 a.m. on September 3.

[¶ 9.] On the evening of September 4, Joe Russell called the police after he watched a news report of Ross' death. Russell informed the police that he had observed Ross and Owens together near a Get–N–Go convenience store around 3:30 a.m. on the morning of September 3. A clerk at the Get–N–Go also testified that Ross and Owens were together that morning. A security camera in the store confirmed that Ross and Owens were both at the store at 3:37 a.m.

[¶ 10.] On September 4, the police executed a search warrant on Owens and his personal property at the jail. They recovered Ross' two rings that were previously inventoried. While executing the search warrant, one of the officers asked Owens whether he had some information regarding a homicide. A short time later, Owens asked to speak with a detective.

[¶ 11.] Detective Openhowski (Openhowski) questioned Owens at approximately 7:00 p.m. on September 4. The interview took place in the detective bureau's interrogation room. The interview was videotaped. Owens initially denied any participation in the homicide. He then gave several conflicting stories. Owens ultimately admitted that he inflicted the injuries that killed Ross, but he denied acting with any criminal intent.

[¶ 12.] After the interview, Openhowski left the room. Owens then called his mother from a portable phone in the interview room. Owens told his mother that he

---

1. The police, however, were not notified of Ross' death until 1:00 p.m.

murdered someone. This phone call was also videotaped.

[¶ 13.] On September 7, 1999 Owens was charged with first-degree murder. Six days later he escaped from jail while in custody on the murder charge. He was captured around 11:30 a.m. that same day.

[¶ 14.] On June 2, 2000, a jury found Owens guilty of three counts of first degree murder: one count of premeditated murder, one count of felony murder in the course of rape or attempt to commit rape, and one count of felony murder in the course of robbery or attempt to commit robbery, all[2] in violation of SDCL 22–16–4.[3] Other facts will be discussed in the analysis of the issues.

[¶ 15.] Owens raises eleven issues on appeal:

1. Whether the trial court should have permitted individual-sequestered voir dire of all prospective jurors.

2. Whether the trial court should have granted additional peremptory challenges.

3. Whether the trial court should have excused certain prospective jurors.

4. Whether the trial court should have excluded evidence of the assault on Poppenga.

5. Whether Owens' statements made in the interview with Detective Openhowski were involuntary and therefore inadmissible.

6. Whether Owens had a subjective or objective expectation of privacy in a telephone call made to his mother in a police interrogation room.

7. Whether the trial court should have permitted the jury to view a transcript of the videotaped interview with Detective Openhowski and the phone call to Owens' mother.

8. Whether the trial court should have excluded evidence of Owens' escape.

9. Whether the trial court should have excluded certain autopsy photographs of the victim.

10. Whether the trial court should have granted a motion for judgment of acquittal at the close of the state's case.

11. Whether the trial court should have granted Owens' motion for a mistrial.

---

**2.** Although the jury found Owens guilty of all three counts, the trial court only entered a judgment of *conviction on one count* of first degree murder, and Owens was only *sentenced* to one sentence of life imprisonment. This conviction and sentence were proper under *Wilcox v. Leapley*, 488 N.W.2d 654 (S.D. 1992). In *Wilcox*, the defendant was convicted of both murder and manslaughter for the death of the same victim. We held that double homicide convictions for a single death were improper. *Id.* at 657. *See also State v. Rough Surface*, 440 N.W.2d 746, 761 (S.D. 1989) "[t]he Court should not assume that the legislature intended that a defendant could be convicted of more than one type of first-degree murder where there is but one death, unless there is a clear intention on the part of the legislature." (Sabers, J., dissenting).

**3.** SDCL 22–16–4 provides:

Homicide is murder in the first degree when perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being, or when committed by a person engaged in the perpetration of, or attempt to perpetrate, any arson, rape, robbery, burglary, kidnapping, or unlawful throwing, placing, or discharging of a destructive device or explosive. Homicide is also murder in the first degree if committed by a person who perpetrated, or who attempted to perpetrate, any arson, rape, robbery, burglary, kidnapping or unlawful throwing, placing or discharging of a destructive device or explosive and who subsequently effects the death of any victim of such crime to prevent detection or prosecution of the crime.

744

## ANALYSIS AND DECISION

**[¶ 16.] 1. Whether the trial court should have permitted individual-sequestered voir dire of all prospective jurors.**

[¶ 17.] Because this homicide generated a great deal of publicity, Owens introduced an "attitudinal survey." The survey revealed that many prospective jurors were familiar with the facts of the case. The survey also suggested that jurors familiar with those facts might hold preconceived opinions that could undermine the trial's fairness. Under those circumstances, Owens contends that individual-sequestered voir dire of every prospective juror was required. We disagree.

■ [¶ 18.] SDCL 23A–20–6 provides that "the court *may in its discretion* allow examination of *one or more* jurors apart from the other jurors." (emphasis added). There is, however, no "right" or "requirement" that prospective jurors be individually examined out of the presence of other jurors. *State v. Tapio*, 459 N.W.2d 406, 413 (S.D.1990); *State v. Bad Heart Bull*, 257 N.W.2d 715, 723 (S.D. 1977). Individual voir dire is only a "precautionary procedure which *may be* permitted, in the discretion of the trial court . . . ." (emphasis added). *Bad Heart Bull*, 257 N.W.2d at 723.

■ [¶ 19.] Moreover, Owens fails to recognize that a potential juror's high degree of familiarity with a case is not, by itself, dispositive. SDCL 23A–20–13.1(11) allows a challenge for cause only if a prospective juror with knowledge of some or all of the material facts of the case also has "an *unqualified* opinion or belief as to the merits of the case." (emphasis added).

■ [¶ 20.] In this case, the trial court granted Owens' request for two juror questionnaires: the first addressed general background information, and the second dealt with pretrial publicity and the jurors' familiarity with the case. Defense counsel was then allowed to question a prospective juror individually if doing so was justified by his or her responses to the questionnaires or voir dire. The actual voir dire was exhaustive, and individual voir dire was permitted where justified. The trial court's procedure permitted a meaningful inquiry of each prospective juror. The denial of Owens' motion for individual-sequestered voir dire of all prospective jurors was not an abuse of discretion.

**[¶ 21.] 2. Whether the trial court should have granted additional peremptory challenges.**

■ [¶ 22.] Owens argues that the nature of the case and the pre-trial publicity required the grant of additional peremptory challenges. The trial court granted Owens one additional peremptory challenge. Owens, however, contends that he should have received ten additional peremptory challenges. He alleges prejudice because he was forced to use his peremptory challenges to remove other potential jurors who he contends expressed opinions concerning his guilt.

■ [¶ 23.] We have recently overruled prior authority which permitted the establishment of prejudice simply by a defendant's use of all peremptory challenges. *State v. Verhoef*, 2001 SD 58, ¶ 18, 627 N.W.2d 437, 440 (overruling *State v. Etzkorn*, 1996 SD 99, 552 N.W.2d 824). A defendant must now show prejudice arising from the seating of jurors who actually served. *Id.* at ¶ 14, 627 N.W.2d at 440. In this case, the mere fact that Owens used all of his peremptory challenges fails, without more, to establish prejudice.

■ [¶ 24.] Owens also failed to establish trial court error. It is the trial court's responsibility to ensure that a fair and impartial jury is selected. *Id.* at ¶ 12, 627 N.W.2d at 440. To assist in that en-

deavor, SDCL 23A–20–21 provides that "[f]or good cause shown, a court may grant such additional challenges as it, in its discretion, believes necessary and proper." This decision is within the discretion of the trial court. *State v. Iron Necklace,* 430 N.W.2d 66, 77 (S.D.1988); *People v. Fort,* 248 Ill.App.3d 301, 187 Ill.Dec. 854, 618 N.E.2d 445, 453 (1993), *cert. denied,* 510 U.S. 1134, 114 S.Ct. 1110, 127 L.Ed.2d 421 (1994).

[¶ 25.]  A review of the voir dire reflects no abuse of discretion in this case. All prospective jurors who served indicated that they could be fair and impartial. They also indicated that they could set aside any preconceptions and focus only on the evidence presented at trial. Other jurors who expressed difficulty in setting aside preconceived opinions were excused for cause. After observing the jurors respond to questions in voir dire, the trial court observed:

> I think that the jurors that you have challenged for cause … who I have denied have all indicated that although they may have formed opinions prior to the start of this trial based upon what they saw in the news, all have indicated that they can set those opinions aside. . . .

The trial court also noted that some prospective jurors even questioned whether the news reporting was accurate, and indicated that they would be fair and impartial and try the case without prejudice to Owens.

[¶ 26.]  This record discloses no abuse of discretion in the denial of Owens' request for ten additional peremptory challenges. Our conclusion is also supported by the fact that we find no error in the trial court's rulings on Owens' challenges for cause discussed in Issue 3.

[¶ 27.]  **3.  Whether the trial court should have excused certain prospective jurors for cause.**

[¶ 28.]  Owens makes two arguments. He first argues that a number of prospective jurors should have been excused for cause because of their exposure to pre-trial publicity. Owens contends these jurors had sufficient familiarity with the case to have developed opinions on the guilt of Owens, the crime alleged, or the escape. Owens also argues that fourteen prospective jurors should have been excused because of prior jury service.

[¶ 29.]  (a) Pre–Trial Publicity and Juror Opinions

[¶ 30.]  Jurors need not be ignorant of the facts and issues. *State v. Martin,* 493 N.W.2d 223, 227 (S.D.1992). A defendant is only entitled to a fair and impartial jury, not a jury that has absolutely no prior knowledge of the facts of the case. *Tapio,* 459 N.W.2d 406 at 413. It has long been recognized that prospective jurors will have some knowledge of pending criminal cases by the pervasive influence of the communications media. *State v. Garza,* 1997 SD 54, ¶ 20, 563 N.W.2d 406, 410; *Boykin v. Leapley, Warden,* 471 N.W.2d 165, 168 (S.D.1991); *State v. Weatherford,* 416 N.W.2d 47, 51 (S.D. 1987).

[¶ 31.]  Consequently, whether jurors are acquainted with the case is "essentially irrelevant." *State v. Banks,* 387 N.W.2d 19, 21 (S.D.1986). The relevant questions are (1) whether a prospective juror with pre-trial knowledge has an *"unqualified* opinion or belief as to the merits of the case," (SDCL 23A–20–13.1(11)), and (2) whether the prospective juror's opinions are so fixed that they cannot impartially judge the guilt of the defendant, (SDCL 23A–20–13.1(21)), *Banks,* 387 N.W.2d at 21. Stated another way, a juror must be able to set aside preconceptions

and judge the case on the facts presented at trial under the instructions given by the trial court. This is all that is required. *See Garza*, 1997 SD 54 at ¶ 15, 563 N.W.2d at 409; *State v. Darby*, 1996 SD 127, ¶ 42, 556 N.W.2d 311, 322; *State v. Hansen*, 407 N.W.2d 217, 220 (S.D.1987).

4.  **Juror M.** Juror M had pre-trial knowledge of the case and expressed the opinion that Owens was "likely guilty." She also stated that she would "probably not" have the same level of impartiality sitting on this case as she would if she were sitting on a DUI case where she had not heard anything about the case. However, she also stated that if given an instruction by the judge that she was to presume the innocence Owens, she could "truly do that." Further, Juror M failed to express any difficulty setting aside preconceived opinions she might have. She specifically stated that she could put aside her preconceived opinions and only consider what was introduced in the courtroom from the evidence stand.

    **Juror H.** Although Juror H had significant familiarity with the case, and although she opined on her pre-trial questionnaire that Owens was guilty, she stated she could set that aside. Juror H indicated that when someone is placed on a jury "you have to put away all of that and operate from the head, from the facts, as they are presented, and so I would do my best to accomplish that." Juror H denied that she could not give Owens a fair shake. Rather, she indicated she could separate her personal thoughts from her professional thoughts.

    **Juror Sc.** Juror Sc recalled specific information about the case. His juror questionnaire also reflected that he had formed an opinion about Owens' guilt. Although Owens argues this juror was not sure whether he could set aside his preconceptions about the case, the record does not support that argument. Juror Sc stated, "I can disregard what I hear in the news media because I've seen too many errors." He also indicated he could follow the court's instructions, decide the case on what he heard in the courtroom and not consider outside sources.

    **Juror I.** Juror I had been a victim of sexual abuse and stalking. She also stated in her questionnaire that she had formed an opinion as to guilt based upon what she had read about the case. However, when asked about the juror questionnaire, she stated she had not formed a conclusion because she had not seen all the evidence. She stated, "I really wouldn't be able to make a decision." She also indicated that she was confident she could judge Owens' guilt based not upon what she heard outside the courtroom, but upon what she heard inside the courtroom from the witness stand. Juror I confirmed that she could set her personal experiences aside. In fact, she stated that because she had "dealt with" her personal experience, it would not affect her thinking. The trial court specifically noted that Juror I could set her personal experiences aside.

    **Juror K.** Juror K had obtained information about the case through media coverage. He also indicated on his questionnaire that he thought Owens was guilty and that it would be difficult to give Owens a presumption of innocence. However, Juror K later indicated that he was confused by these questions. Juror K then distinguished between the act of causing the death and the ultimate conclusion of murder. He ultimately stated that he truly and honestly believed that he could give the presumption of innocence to Owens.

    **Juror S.** Juror S initially indicated that she did not think she could refrain from talking about the case. However, after instructions from the Judge concerning this issue, she indicated that she could probably refrain from talking about the case.

    **Juror L.** Juror L indicated on a jury questionnaire that, based upon pre-trial publicity, she thought that Owens was probably guilty. However, after sitting through voir dire, she indicated that she then realized that a person is innocent until proven guilty and that she could follow the court's instruction that Owens was presumed innocent. She also indicated she could set aside any preconceived opinions and decide guilt only on what she heard from the witness stand.

[¶ 32.] We find that no prospective juror, when his or her answers are considered in their entirety, held unqualified opinions or evinced an inability to impartially perform their duties in accordance with the court's instructions and the jurors' oath.[4] Owens, however, argues

that the rehabilitation testimony of these jurors should not overcome their initial answers to the written questionnaires and direct questioning. We disagree.

■ [¶ 33.] SDCL 23A–20–16 provides that challenges to prospective jurors "shall be tried by the court." SDCL 23A–20–17 provides that the juror "may be examined as a witness to prove or disprove the challenge...." *Id.* After hearing evidence, the court must allow or disallow the challenge. SDCL 23A–20–18. These statutes contemplate that the trial court should consider *all* relevant evidence regarding the challenge, whether the evidence was elicited on direct or cross-examination of the prospective juror.

■ [¶ 34.] Our cases confirm that conclusion. The determination of a juror's qualifications must be based upon the whole voir dire examination. *Moeller,* 2000 SD 122 at ¶ 30, 616 N.W.2d at 435; *State v. Blem,* 2000 SD 69, ¶ 25, 610 N.W.2d 803, 809; *Garza,* 1997 SD 54 at ¶ 14, 563 N.W.2d at 409. We have repeatedly stated that "single isolated responses are not determinative." *Moeller,* 2000 SD 122 at ¶ 30, 616 N.W.2d at 435; *Garza,* 1997 SD 54 at ¶ 14, 563 N.W.2d at 409; *Darby,* 1996 SD 127 at ¶ 34, 556 N.W.2d at 320.

[¶ 35.] A very recent decision of this Court is also instructive. In *Verhoef,* we reviewed a trial court's failure to remove challenged jurors. 2001 SD 58, 627 N.W.2d 437. One of the challenged jurors was acquainted with the defendant, the victim, and another family member. The other challenged juror had "strong feelings" about sexual contact cases. In reviewing the challenges, we considered direct and rehabilitation evidence. We observed that "[a]lthough a potential juror may express a predetermined opinion during voir dire, once [the juror] has declared under oath that [the juror] can act fair and impartial, [the juror] should not be disqualified...." *Id.* at ¶ 13, 627 N.W.2d at 440 (citing *State v. Knoche,* 515 N.W.2d 834, 840 (S.D.1994)). We decline to adopt a different rule that would preclude a trial and examination of all evidence relevant to a juror's qualifications.

[¶ 36.] (b) Prior Jury Service

■ [¶ 37.] Owens next contends that fourteen potential jurors should have been removed for cause because they had prior jury service. Each juror's prior service occurred within two years of Owens' trial, but the prior service was within each juror's same term[5] of jury duty in Minnehaha County.

[¶ 38.] SDCL 23A–20–13.1(13) authorized a challenge for cause "if the prospective juror previously served as a juror in the county within [two] years." Owens contends that, even though the prior ser-

---

**Juror Mc.** The arguments concerning Juror Mc arise out of his company's involvement in the search for Owens. However, Owens' arguments are immaterial. Juror Mc was excused and the Defendant was not required to exercise a peremptory challenge to remove him.

We finally note that of these challenged jurors, only Juror Sc actually deliberated on Owens' case. His voir dire discloses no basis for disqualification.

5. Terms of jury duty are set by the presiding judge under SDCL 16–13–22:

The presiding judge of each circuit, or a judge of the circuit court designated by the presiding judge, shall issue an order prior to October first of each year to the clerk of courts that a petit jury for the county or jury district be selected. The order shall specify the total number of jurors to be selected, the number of panels or sections of the panels into which the number of jurors are to be arranged, and *the period of time of service during the year* for each panel or section. The names shall be selected for each panel or section by lot as provided in § 16–13–27. (emphasis added).

vice was within the same term of jury duty, a literal reading of the rule allowed the challenge because the prospective jurors had served at *any* time within two years of Owens' trial.

[¶ 39.] We do not, however, reach this issue because Owens has failed to establish prejudice. As previously noted, a defendant challenging jurors on appeal must establish both error and prejudice. *Verhoef,* 2001 SD 58 at ¶¶ 13–14, 627 N.W.2d at 440. *See also* SDCL 23A–44–14 (error plus prejudice is required for reversal). Therefore, Owens must establish not only that there was error, but also that the twelve jurors who heard the evidence and convicted him were not impartial. *Verhoef,* 2001 SD 58 at ¶ 19, 627 N.W.2d at 442.

[¶ 40.] In this case, only three of the fourteen challenged jurors actually served in Owens' case, and all three indicated that they could be impartial. Additionally, we note that prior jury service does not impair the ability of jurors to decide a defendant's case fairly and impartially. As the Supreme Court of New York observed, the essential qualities necessary for fair jury service are not vitiated by prior jury service. "A disqualification of [this] type ... is essentially 'technical' in nature, for it merely reflects the public policy view that excessive jury service should not be imposed and a class of professional jurors should not be created." *People v. Foster,* 100 A.D.2d 200, 473 N.Y.S.2d 978, 981 (N.Y.App.Div.1984) (internal citations omitted), *aff'd as modified by* 64 N.Y.2d 1144, 490 N.Y.S.2d 726, 480 N.E.2d 340 (1985), *cert. denied sub nom Foster v. New York,* 474 U.S. 857, 106 S.Ct. 166, 88 L.Ed.2d 137 (1985).[6] Conse-

quently, Owens has failed to establish prejudicial error.

[¶ 41.] **4. Whether the trial court should have excluded evidence of the assault on Poppenga.**

[¶ 42.] Owens argues that the trial court erred in admitting the evidence of his assault on his girlfriend a short time before Ross' death. The trial court concluded the evidence was admissible as part of the *res gestae* and as "other acts" evidence under SDCL 19–12–5 (Rule 404(b)). We agree that the evidence was admissible as other acts evidence under Rule 404(b).

[¶ 43.] Under Rule 404(b), evidence of prior bad acts is not admissible to prove character. Other acts evidence is, however, admissible when similar in nature, when relevant to another material issue, and when not substantially outweighed by its prejudicial impact. *State v. Wright,* 1999 SD 50, ¶ 14, 593 N.W.2d 792, 799. A trial court's decision to admit other acts evidence is reviewed under the abuse of discretion standard. *Id.* at ¶ 12, 593 N.W.2d at 799 (citing *State v. Loftus,* 1997 SD 94, ¶ 21, 566 N.W.2d 825, 830) (further citations omitted).

[¶ 44.] Here, as in *Wright,* Owens' prior conduct was relevant to prove intent, the absence of mistake or accident, and the absence of unintended consequences. Owens was charged with the specific intent crimes of premeditated murder and murder in the course of, or attempt to commit, rape and robbery. Those charges required that the State prove Owens acted with a premeditated design to effect Ross' death, and in an attempt to rob and rape her. SDCL 22–16–4.

---

**6.** Although the New York Supreme Court ultimately reversed Foster's conviction, it did so because the State of New York followed the rule which permitted the establishment of prejudice merely by exercising all peremptory challenges. *Foster,* 473 N.Y.S.2d at 983. Although this Court rejected that rule in *Verhoef,* the *Foster* language that relates to the purpose of challenges for prior jury service is still applicable.

[¶ 45.] Owens admitted committing the physical acts that killed Ross. His defense was that he did not act with the requisite criminal intent. Owens offered a number of explanations and justifications. In some accounts, he specifically denied criminal intent. He stated, "I didn't mean to hurt that girl." On another occasion, he stated that things "just got out of hand and I snapped." He also denied criminal intent with respect to the rocks he put in Ross' mouth. In a letter to Poppenga, he indicated that Ross

> "was screaming ... [but] the rock situation [wasn't] intended to kill her. Only in my mind at the time to keep her quiet.... Because in all the times we [Owens and Poppenga] got really into it[,] I never liked to [hear] you scream. I was always trying to cover your mouth or something. And that was the frame of mind I was in at the time."

Owens also alleged mistake, accident, or justification. He stated, "I guess I had my hands on her throat like this.... I must have held it too long or too tight." He stated, "something happened here to ignite the situation." He even stated, "all I remember was that she was reaching for my billfold and trying to take my billfold and I tripped."

[¶ 46.] In light of these statements, Owens' assault of Poppenga was relevant to negate his intent defense and his claims of accident, mistake, justification, and unintended consequences. Owens' conduct with Poppenga was very similar to his conduct with Ross. During the course of the Poppenga assault, just a short time before Ross' death, Owens grabbed Poppenga by the mouth and neck in a manner similar to that which caused Ross' death. Owens' conduct in both cases caused an obstruction of the mouth and neck causing an asphixial or strangulation process. Owens also told Poppenga to "shut up" and threatened that if she "wasn't quiet he was going to hurt [her] worse than what he was doing." (emphasis added). In each case, Owens converted his stated intent into a completed act. Poppenga blacked out, and Ross died from a similar asphixial or strangulation process. Owens' conduct and intent in both cases tended to prove Owens intended to "hurt [Ross and Poppenga] worse than what he was doing" to "shut [them] up." His prior conduct also negated his subsequent claims of accident, mistake, justification and unintended consequences.

[¶ 47.] Owens admitted causing Ross' death. His mental state was the central issue in this trial. One of the questions was whether Owens acted with a premeditated design to affect death. As the Court of Appeals in Michigan noted, when a defendant admits to the killing, but attempts to put state of mind at issue, any words or conduct shedding light on that issue are admissible even though they disclose other criminal acts. *People v. Cramer*, 97 Mich. App. 148, 293 N.W.2d 744, 749 (1980) (holding that under Rule 404(b), an assault a few hours earlier was admissible to prove intent in a subsequent murder).

[¶ 48.] In this case, Owens' similar conduct in the assault of Poppenga was factually relevant to refute Owens' assertion that he did not have the state of mind necessary to commit first degree murder. Owens' prior conduct also negated his subsequent claims of accident, mistake, justification, and unintended consequences. There was no abuse of discretion in admitting this evidence.

[¶ 49.] **5. Whether Owens' statements made in the interview with Detective Openhowski were involuntary and therefore inadmissible.**

[¶ 50.] Owens argues that the statements made during the interview with Detective Openhowski should have been suppressed because they were not freely

and voluntarily given. Owens claims that his statements were involuntary because he alleges that Openhowski: (1) misled Owens about the interview being recorded; (2) lied to Owens about police possession of evidence linking him to the crime; (3) misled Owens about the penalty and consequences of a murder conviction; (4) encouraged Owens to call his mother and to tell the truth; and (5) told Owens to tell (Openhowski) "everything." Owens argues that, when considered together, these acts improperly coerced him into making incriminating statements.

[¶ 51.] Our standard of review regarding the voluntariness of confessions and incriminating statements is well established. The State has the burden of proving beyond a reasonable doubt that a confession or incriminating statement was freely and voluntarily made. *State v. Jenner*, 451 N.W.2d 710, 716 (S.D.1990). A trial court finding that a confession or incriminating statement was voluntary beyond a reasonable doubt is binding upon this Court unless we conclude from our review of the record that the finding is clearly erroneous. *State v. Faehnrich*, 359 N.W.2d 895, 898 (S.D.1984); *State v. Headrick*, 357 N.W.2d 268, 270 (S.D.1984). We consider the evidence in a light most favorable to the trial court's finding. *State v. Thompson*, 1997 SD 15, ¶ 29, 560 N.W.2d 535, 542.

[¶ 52.] Incriminating statements or confessions are involuntary if, in light of the totality of the circumstances, the will of the defendant was overborne. *State v. Smith*, 1999 SD 83, ¶ 36, 599 N.W.2d 344, 352.

Factors that we will examine include: 1) the defendant's age; 2) the defendant's lack of education or low intelligence; 3) the absence of any advice to the defendant of his constitutional rights; 4) the length of detention; 5) the repeated and prolonged nature of questioning; and 6)

the use of physical punishment such as deprivation of food or sleep. A defendant's prior experience with law enforcement officers and the courts is also a factor this Court considers. *The question is not whether the interrogators' statements were the cause of the confession but whether those statements were so manipulative or coercive that they deprived [a defendant] of his ability to make an unrestrained, autonomous decision to confess.*

*Id.* (emphasis added) (quoting *State v. Smith*, 1998 SD 6, ¶ 8, 573 N.W.2d 515, 517).

[¶ 53.] Additionally, although police deception or misrepresentation may be another factor for a trial court to consider, the police may use psychological tactics in interrogating a suspect. *State v. Frazier*, 2001 SD 19, ¶ 20, 622 N.W.2d 246, 255; *State v. Anderson*, 2000 SD 45, ¶ 82, 608 N.W.2d 644, 667. *Darby*, 1996 SD 127 at ¶ 31, 556 N.W.2d at 320. As we recognized in *State v. Stanga*, "trickery is sometimes a legitimate interrogation technique." 2000 SD 129, ¶ 19, 617 N.W.2d 486, 491. Therefore, deception by the police is not sufficient to make an otherwise valid confession inadmissible unless it appears that the deception produced a coerced or involuntary confession. *Frazier*, 2001 SD 19 at ¶ 20, 622 N.W.2d at 255; *Smith*, 1999 SD 83 at ¶ 36, 599 N.W.2d at 352; *Darby*, 1996 SD 127 at ¶ 31, 556 N.W.2d at 320.

[¶ 54.] The trial court considered the *Smith* factors and found that Owens voluntarily participated in this interview. We agree.

[¶ 55.] Owens was 37 years old. He stated that he had a high school education, and he appeared to be of average intelligence. Owens was advised of his *Miranda* rights. Moreover, he had at least two prior felony convictions and knew that he

had the right to prevent further questioning because he actually broke off the questioning on more than one occasion. Although the interview was lengthy, it was not particularly adversarial or coercive. The record reflects substantial give-and-take between Openhowski and Owens. Finally, there is no evidence of any physical punishment. Owens was not deprived of sleep, and he was supplied with soda and cigarettes.

[¶ 56.] It is also significant that, at the time of the interview, Owens was under arrest for a different crime, and it was Owens who demanded the interview with a detective about Ross' death. The record reflects that, when Openhowski started the interview, Owens was so eager to talk that Openhowski had some difficulty giving Owens his *Miranda* rights. When Openhowski was finally able to advise Owens of his right to remain silent and the fact that his statements would be used against him, Owens responded, "I got to talk to you...." This record does not suggest that Owens' will was overborne.

[¶ 57.] Owens' specific complaints of deception are either overstated, taken out of context, or had no influence on his ability to make an unrestrained, autonomous decision to participate in the interview. For example, even if one assumes that Openhowski's conduct concerning the presence of a recording device was deceptive, Owens was not subjectively deceived. Owens' conduct during the interview demonstrated that he knew, or at least suspected, that the interview was being taped. Indeed, during the interview, Owens stated, "you've got me and I have to go to court to tell it like it is. Intercom here, the speaker thing, [is] taping everything I'm saying." Owens' conduct belies his contention that he was actually deceived about the presence of a recording device.

[¶ 58.] Equally important is the fact that Openhowski's deceptive conduct related only to the *presence* of a recording device. Owens was never misled about the fact that the statements given would be used against him. Near the beginning of the interview Owens asked Openhowski whether the interview was going to be tape-recorded. Openhowski indicated that it was not, and he raised his shirt to show Owens that Openhowski was not "wired." Although Openhowski's actions were deceptive, Owens responded that he knew Openhowski was going to advise him that everything he said was going to be used against him. Additionally, after Openhowski read Owens his *Miranda* rights, Owens indicated that he wanted to talk and that he knew his statements would be used against him. Owens even stated that he would testify as to everything he told Openhowski. Therefore, unlike the deception in *Stanga*, 2000 SD 129 at ¶ 19, 617 N.W.2d at 490–91, the deception here did not mislead Owens about his constitutional rights. Consequently, the deception concerning the recording device was irrelevant.

[¶ 59.] Owens' second complaint was that the police repeatedly referred to incriminating evidence that did not exist. During the interview, Openhowski told Owens that: (1) police had his fingerprints on the rocks that were in Ross' mouth; (2) there was an eyewitness who saw Owens with Ross near the railroad tracks on the morning in question; (3) police found Owens' DNA in Ross' body; (4) Ross' blood was found on Owens' shoes; and (5) Owens' semen was found in Ross' body.

[¶ 60.] In *Smith*, 1998 SD 6 at ¶ 15, 573 N.W.2d at 519, we held that police misrepresentations regarding the strength of evidence against a defendant does not render a confession involuntary. Other states agree. *See Henry v. State*, 738 N.E.2d 663, 664 (Ind.2000); *State v. Bays*, 87 Ohio St.3d 15, 716 N.E.2d 1126, 1137 (1999);

*People v. Givans,* 227 Mich.App. 113, 575 N.W.2d 84, 89 (1997). As we noted in *Smith,* an interrogating officer's implication that police have more information about a crime than they actually have is a psychological tactic which does not upset a finding of voluntariness as long as the confession is a product of the suspect's own balancing of competing considerations. *Smith,* 1998 SD 6 at ¶ 15, 573 N.W.2d at 519. In this case, the use of non-existing evidence did not interfere with Owens' balancing of competing considerations as he made his decision to confess. On the contrary, Owens repeatedly challenged or refuted Openhowski when Owens was confronted with non-existing evidence.

■ [¶ 61.] Owens also complained about Openhowski's reference to the penalties and consequences of a murder conviction. During the interview, Openhowski talked to Owens about Charles Sisney, who was then serving a life sentence for murder. Owens points out that Openhowski incorrectly stated, "[Sisney] went in the first day and pled guilty.... He got like sixty or seventy years or something like that." At the same time, however, Openhowski also told Owens, "I can't make you promises. I can't make you deals. I can't do anything." Openhowski further stated, "I can't promise you anything." When considered in context, the evidence does not indicate that Openhowski actually misled Owens about the penalties and consequences of a murder conviction.

■ [¶ 62.] Owens next complained that Openhowski encouraged Owens to tell his mother what happened. The record reflects that, on three occasions before Owens confessed, Openhowski encouraged Owens to call his mother to tell her what happened before she found out from the media. After Owens confessed, Openhowski told him, "I've done this job long enough to know that you owe [your mother] that much, if you love her like you say

you do." Owens eventually called his mother and confessed to killing Ross. However, at that point Owens had already incriminated himself. Moreover, the record does not reflect that this encouragement, when viewed in context, deprived Owens of his ability to make an autonomous decision to confess.

■ [¶ 63.] Owens finally complains about Openhowski's statement that he had to tell Openhowski "everything." The following conversation took place:

> Detective: So how do you want to play this thing?
>
> Owens: I'm just going to go to the judge and tell him *everything.*
>
> Detective: You have to tell me *everything.* We can dance around it, or you can tell me the real story, and be done in five minutes....

This exchange reveals that Owens had already decided to "tell everything" before Openhowski made his statement. Owens' argument that this conversation coerced him into making a statement is without merit.

■ [¶ 64.] Even when considered together, the police deception about the strength of their case, their statements about possible penalties, their suggestion that Owens talk to his mother, and their statement that Owens had to tell them everything did not render his statements involuntary. On the contrary, each of Owens' complaints is overstated, taken out of context, or had no impact on his ability to make an uncoerced, autonomous decision to make statements. When reviewed in context, the entire interview reveals that Owens voluntarily participated with Openhowski, that Owens' confession was the product of his own balancing of competing considerations, and that his will was not overborne by the detective's tactics.

**[¶ 65.] 6. Whether Owens had a subjective or objective expectation of privacy in a telephone call made to his mother in a police interrogation room.**

[¶ 66.] After his interview with Detective Openhowski, Owens called his mother from the interrogation room. During the course of the telephone conversation, Owens made incriminating statements to his mother, including, "I murdered someone.... I snapped on Amber [Poppenga] that night and then some other chick [Ross] and then I ended up killing her." This phone conversation was videotaped and admitted into evidence.

[¶ 67.] Owens contends that he had a subjective and objective expectation of privacy in this phone call. Owens points out (1) that he was led to believe, early in the interview, that it was not being recorded; (2) that he made the call from a portable phone, which he described as a "private" line; (3) that he was not informed that the call would be videotaped; and (4) that he was alone in the interrogation room with the door shut when the call was made. Owens contends that under these circumstances, his conversation was a private "oral conversation" within the meaning of SDCL 23A–35A–1(10).[7] Owens argues that the unauthorized interception of an "oral conversation," in violation of SDCL ch. 23A–35A, violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution and Art VI § 11 of the South Dakota Constitution. We do not, however, reach this constitutional argument because we find that the phone call was not an "oral communication" within the meaning of SDCL 23A–35A–1(10).

[¶ 68.] SDCL ch. 23A–35A regulates the interception of wire and "oral communications." An oral communication is protected only if it is uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying the expectation. SDCL 23A–35A–1(10). Therefore, Owens had to exhibit an expectation of privacy. Furthermore, any such expectation must have been justified. *State v. Iverson,* 364 N.W.2d 518, 525 (S.D.1985); *State v. Woods,* 361 N.W.2d 620, 621 (S.D. 1985).

[¶ 69.] If this were a constitutional inquiry, Owens would bear the burden of establishing that he manifested a subjective expectation of privacy and that any such expectation, when viewed objectively, was reasonable. *State v. Rewolinski,* 159 Wis.2d 1, 464 N.W.2d 401, 406 (1990). *See United States v. Knotts,* 460 U.S. 276, 281, 103 S.Ct. 1081, 1084–85, 75 L.Ed.2d 55, 61–62 (1983); *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220, 226 (1979); and *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (Harlan, J., concurring) (1967). We conclude that Owens must also bear that burden under the similar statutory provisions of SDCL ch. 23A–35A.

[¶ 70.] After observing Owens' conduct on the videotape, the trial court found that Owens was not subjectively deceived. The court noted that "at approximately 10:04:32 of the video recording [Owens] appears to first notice the metal plate with the video lens and bends over and looks at it closely." The trial court noted that thereafter, Owens stood in positions to block the view of the camera or sit in a position that was out of the view of the camera. Shortly before the phone call,

---

**7.** SDCL 23A–35A–1(10) provides: " 'Oral communication,' any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation."

Detective Openhowski left and reentered the room. At that time Owens stated the "intercom thing, speaker thing, [is] taping everything I'm saying." Later, while talking to his mother, Owens again got up and approached the metal covering and clearly attempted to place his thumb over the place in the cover where the holes were located. The trial court observed that Owens' conduct made it "obvious to anyone watching the tape that the Defendant knew and believed he was being recorded during the phone call." The trial court ultimately found that, "[d]uring the entire time of the phone call to his mother [Owens] was not exhibiting an expectation that such communication was not subject to interception...." We agree.

[¶ 71.] Owens also had no objective-justifiable expectation of privacy in the interrogation room of a police station. In *State v. McKercher*, 332 N.W.2d 286 (S.D.1983), the defendant was arrested, interrogated and made admissions in the interrogation room of a jail. Later that day, he made a phone call to his wife from a phone room in the jail. Those statements, in an even more private setting, were monitored by a jailer. The defendant argued that he had a reasonable (and subjective) expectation that his phone conversation would be private. We disagreed, noting that a prisoner's constitutional rights are subject to restrictions. *Id.* at 287. We stated, "[t]hese restrictions allow jail officials to monitor and record conversations between detainees and their visitors for security reasons and to use the conversation as evidence against the detainee without violating the Fourth Amendment." *Id.* (citing *U.S. v. Hearst*, 563 F.2d 1331 (9thCir.1977), *cert. denied*, 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978)). *See*

*also State v. Strohl*, 255 Neb. 918, 587 N.W.2d 675, 682 (1999) (holding there is no reasonable expectation of privacy in a jail visiting room); *State v. Weikle*, 239 Neb. 157, 474 N.W.2d 486, 489 (1991) (holding that there is no reasonable expectation of privacy in a jail cell).

[¶ 72.] Under these circumstances, Owens had no objective or subjective expectation of privacy in the interrogation room of a police station. Therefore, Owens' conversation was not a protected "oral communication" under SDCL 23A–35A–1(10).

[¶ 73.] **7. Whether the trial court should have permitted the jury to view a transcript of the videotapes of the interview with Detective Openhowski and the phone call to Owens' mother.**

[¶ 74.] The trial court permitted the jury to view a transcript of the audio portion of the videotapes of Owens' interview with Openhowski and Owens' conversation with his mother. The jury was permitted to view the transcript while they watched and listened to the videotapes. Owens contends that this trial aid should not have been used because the transcript "could be misleading"[8] and because it was not an exact reproduction of the audio portion of the videotapes.

[¶ 75.] We have previously considered this issue in *Faehnrich*, 359 N.W.2d 895. There we held that typed transcripts may be used as visual aids when listening to recorded conversations. *Id.* at 899. We review the trial court's admission of transcripts under an abuse of discretion standard. *Id.*

---

**8.** Owens also argues that the jury could arguably spend more time on what "could prove" to be an inaccurate statement in the transcript rather than paying attention to the actual videotape. Owens has not alleged any actual inaccuracy. Therefore, we do not address his inaccuracy inference.

[¶ 76.] In this case, the videotapes were approximately three and one-half hours in length. The trial court found that it would be extremely difficult, if not impossible, to understand the recordings without the benefit of a transcript. In addition, the trial court instructed the jury that the transcript could be used only for the limited purpose of helping the jury understand and follow the conversations as the jury was listening to the audio portion of the tapes. The trial court specifically admonished the jury that the videotape itself was the primary evidence, and that the jury should rely on what they heard, rather than what they read. The trial court finally permitted Owens' counsel to highlight any areas in the transcript which Owens contended were inaccurate. In areas where there was a dispute concerning accuracy, the trial court found that the problem was insignificant. The trial court did not abuse its discretion allowing the jury to view the transcript.

[¶ 77.] **8. Whether the trial court should have excluded evidence of Owens' escape.**

■■■ [¶ 78.] Owens escaped from jail six days after he was charged with murder. The trial court admitted this evidence over Owens' objection. The admissibility of escape evidence is subject to the rule of relevancy, SDCL 19–12–2 (Rule 402), and the related rule of prejudice versus probative value, SDCL 19–12–3 (Rule 403). A trial court's evidentiary rulings are presumed correct and are reviewed under an abuse of discretion standard. *State v. Perovich,* 2001 SD 96, ¶ 11, 632 N.W.2d 12, 15.

■■■ [¶ 79.] Although we have not previously considered the admissibility of an escape, we have concluded that failure to appear and flight are both admissible to show consciousness of guilt. *State v. Fast Horse,* 490 N.W.2d 496 (S.D.1992); *State v.*

*Waller,* 338 N.W.2d 288 (1983); and *Marshall v. State,* 305 N.W.2d 838 (S.D.1981). Other jurisdictions apply the same rule for escape. *People v. Box,* 23 Cal.4th 1153, 99 Cal.Rptr.2d 69, 5 P.3d 130, 164 (2000), *cert. denied sub nom. Box v. California,* 532 U.S. 963, 121 S.Ct. 1497, 149 L.Ed.2d 383 (2001); *State v. Middleton,* 998 S.W.2d 520, 528–529 (Mo.1999), *cert. denied sub nom. Middleton v. Missouri,* 528 U.S. 1167, 120 S.Ct. 1189, 145 L.Ed.2d 1094; *State v. Knighten,* 212 Wis.2d 833, 569 N.W.2d 770, 772–773 (Wis.App.1997); *Macias v. State,* 673 So.2d 176, 184 (Fla.App. 1996), *review denied,* 680 So.2d 423 (1996); *Clay v. State,* 318 Ark. 122, 883 S.W.2d 822, 829 (1994); *People v. Wilson,* 257 Ill.App.3d 670, 195 Ill.Dec. 8, 628 N.E.2d 472, 483 (1993), *appeal denied,* 155 Ill.2d 575, 198 Ill.Dec. 552, 633 N.E.2d 14 (1994); *Williams v. State,* 832 S.W.2d 152, 154 (TexApp—Hous.14 Dist.1992). In *United States v. Hankins,* the Eighth Circuit Court of Appeals noted "no distinction that would warrant an analytical approach [to escape that would be] different from that used in flight cases. Flight and escape are similar acts." 931 F.2d 1256, 1261 (8thCir.1991). We adopted that analysis in *Waller,* 338 N.W.2d at 292 (a failure to appear case). We now find that escape is analytically similar to flight in proving consciousness of guilt.

■■■ [¶ 80.] Under the flight/escape analysis, there must be a sufficient temporal connection. An inference of guilt may be drawn from the fact of flight (escape) if that act occurs "immediately after the commission of a crime, *or after* [a defendant] *is accused of a crime that has been committed." Waller,* 338 N.W.2d at 292 (citing *United States v. White,* 488 F.2d 660, 662 (8thCir.1973) (emphasis in original)). Here, the time between Ross' death, Owens' charges, and his subsequent

escape was very close. There was a sufficient temporal connection.

[¶ 81.] Owens, however, argues that even if escape evidence reflects an accused's consciousness of guilt, escape is primarily relevant only where the accused denies any involvement in the crime. Because Owens did not deny that he caused Ross' death, he contends that his escape was not relevant. We disagree.

[¶ 82.] We have previously stated that "[a]n attempt by the accused to flee following commission of the alleged crime is circumstantially relevant to prove not only commission of the act, *but also the intent and purpose* with which it was committed." (emphasis added). *Fast Horse,* 490 N.W.2d at 501. Because Owens' intent and purpose were at issue, his escape was relevant.

[¶ 83.] Owens also objected to the specific escape evidence that was actually admitted. Over objection, the prosecutor twice labeled the search for Owens as a "manhunt." The State also questioned a witness about the scope of the police search for Owens. The witness responded that he alerted a nearby grade school to "get the teachers to take [the children] inside."

[¶ 84.] The relevant escape evidence is the conduct of the accused because that is the conduct that tends to show the intent and consciousness of the accused. On the other hand, evidence of *police conduct* in performing a search for the accused does not reveal anything about the *accused's* intent or consciousness of guilt. Therefore, police conduct in performing this search was not relevant. We nevertheless conclude that the admission of this irrelevant evidence was harmless error.

[¶ 85.] In conducting harmless error analysis, we decide whether the erroneously admitted evidence was harmless

beyond a reasonable doubt. *Stanga,* 2000 SD 129 at ¶ 20, 617 N.W.2d at 491. In conducting that analysis, we may consider corroborating evidence. "[T]he presence of corroborating evidence more appropriately indicates that any error in admitting the statement might be harmless...." *Idaho v. Wright,* 497 U.S. 805, 823, 110 S.Ct. 3139, 3150–51, 111 L.Ed.2d 638, 657 (1990).

[¶ 86.] Here, the evidence against Owens was overwhelming. The evidence placed Ross and Owens together shortly before her death, and Owens was found in possession of her rings shortly after her death. Owens also confessed to a detective, to his mother, and to Poppenga. We also note that the inadmissible testimony was elicited in passing and was confined to three isolated instances. Considering all of the evidence and circumstances, we are convinced beyond a reasonable doubt that the irrelevant testimony would not have made a difference in the jury's determination. The admission of that evidence was harmless error.

[¶ 87.] **9. Whether the trial court should have excluded certain autopsy photographs of the victim.**

[¶ 88.] Owens objected to autopsy photographs and slides which depicted a front facial view of Ross' eyes, nose, mouth, and the rocks that were in her mouth. We review the trial court's admission of photographs and slides under an abuse of discretion standard. *State v. Disbrow,* 266 N.W.2d 246, 253 (S.D.1978); *State v. Kaseman,* 273 N.W.2d 716, 726 (S.D.1978); *State v. Miller,* 248 N.W.2d 56, 60 (S.D.1976); *State v. Hoover,* 89 S.D. 608, 618, 236 N.W.2d 635, 640 (1975).

[¶ 89.] It is well settled that photographs are generally admissible where they accurately portray anything that a witness may describe in words.

They are also admissible when they are helpful in clarifying a verbal description of objects and conditions. They must, however, be relevant to some material issue. *State v. Holland,* 346 N.W.2d 302, 307 (S.D.1984). If relevant, photographs are not rendered inadmissible merely because they incidentally tend to arouse passion or prejudice. *Id; State v. Huth,* 334 N.W.2d 485, 489 (S.D.1983); *State v. Rash,* 294 N.W.2d 416, 418 (S.D.1980); *Disbrow,* 266 N.W.2d at 254. Autopsy photographs fall within these rules. Although disturbing and cumulative, autopsy photographs may be admitted when they are necessary to aid in an expert's presentation of evidence. *State v. Novaock,* 414 N.W.2d 299, 302 (S.D.1987).

[¶ 90.] Owens argues that the photographs were not necessary to aid in the coroner's presentation of the evidence. Owens first objects to the pictures of the victim's face and mouth depicting "fly egg" deposits. Owens argues that these photographs were not necessary because Owens did not dispute the victim's identity or the presence of fly eggs.

[¶ 91.] Dr. Randall, however, testified that the photographs would assist him in explaining his examination and findings. The photographs of the victim's face assisted with Ross' identification. The presence of fly eggs helped establish the time of death. Owens' stipulation to these facts did not relieve the State of its burden of proving the necessary elements of the alleged offense. The State is not bound by this type of defense offer to stipulate to facts. *State v. Eagle Star,* 1996 SD 143, ¶ 26, 558 N.W.2d 70, 75–76; *State v. Muetze,* 368 N.W.2d 575, 586 (S.D.1985). Therefore, the photographs were admissible to establish identity and time of death.

[¶ 92.] Owens also objected to photographs which depicted trauma to the victim's mouth. Owens, however, denied acting with criminal intent, and the photo-

graphs illustrated the kind and degree of force inflicted to cause Ross' injuries. These photographs were inconsistent with Owens' claims of accident, mistake, justification and unintended consequences. Therefore, the photographs depicting substantial trauma and the kind and degree of force used were admissible.

[56] [¶ 93.] Owens finally contends that the photographs of the rocks in Ross' mouth were not relevant. However, this evidence aided Dr. Randall's determination that one of the possible causes of death was traumatic asphyxia. The trial court did not abuse its discretion in allowing any of these photographs into evidence.

[¶ 94.] **10. Whether the trial court should have granted a judgment of acquittal at the close of the state's case.**

[¶ 95.] At the end of the state's case, the trial court denied Owens' motion for judgment of acquittal on each of the three murder charges. Owens argues that there was insufficient evidence to establish a premeditated design to effect the death of Ross, that there was insufficient evidence to establish felony murder (robbery), and that there was insufficient evidence to establish felony murder (rape). We disagree. The evidence, together with all reasonable inferences therefrom, sustained a rational theory of premeditated design, intent to commit robbery, and intent to commit rape.

[57, 58] [¶ 96.] With respect to premeditation, Owens relies only upon his favorable conduct before and after the homicide. However, direct proof of deliberation and premeditation is not necessary. It may be inferred from the circumstances of the killing. *State v. Kost,* 290 N.W.2d 482, 486 (S.D.1980); *State v. Bean,* 265 N.W.2d 886, 890 (S.D.1978). Those circumstances include the use of a

deadly weapon, the manner of the killing, and the presence or absence of provocation. *State v. Helmer*, 1996 SD 31, ¶ 38, 545 N.W.2d 471, 477; *State v. Corder*, 460 N.W.2d 733, 739 (S.D.1990). Moreover, extensive planning and calculated deliberation need not be shown to establish premeditation. SDCL 22–16–5; *State v. Alton*, 432 N.W.2d 754, 756 (Minn.1988). The design to effect death need exist only for an instant before the commission of a crime. *Kost*, 290 N.W.2d at 486; *Bean*, 265 N.W.2d at 890; *State v. Marshall*, 264 N.W.2d 911, 914 (S.D.1978).

[¶ 97.] Here, Owens focuses only on selective non-violent conduct before and after the homicide. There was, however, other evidence of Owens' violent state during the entire period of time. Owens admitted, "I was mad and stressed out and I ended up beating Amber [Poppenga] up, and I left the house and it [the murder] happened then." The evidence also revealed that Ross died in an extremely brutal manner. Dr. Randall testified that very significant force and injuries were involved. Ross' jaw was fractured, there was evidence of multiple blows and trauma to Ross' windpipe, the hyoid bone in Ross' neck was broken, and there were rocks forced into Ross' mouth. The jury could have considered all of these facts to be circumstantial evidence of actions designed to inflict death. *See People v. Memro*, 11 Cal.4th 786, 47 Cal.Rptr.2d 219, 905 P.2d 1305, 1347 (1995), *cert. denied sub nom Memro v. California*, 519 U.S. 834, 117 S.Ct. 106, 136 L.Ed.2d 60 (1996) (method of killing alone can sometimes support a conclusion that the evidence sufficed for a finding of premeditated murder). The record finally reflects that the body was left in a position that indicated an attempt to conceal it. Attempts to conceal or dispose of evidence may also support an implicit finding of premeditation. *Helmer*, 1996 SD 31, ¶ 39, 545 N.W.2d at 478. We find that there was sufficient circumstantial evidence of premeditation to submit this case to the jury.

[¶ 98.] Owens also argues that the evidence was insufficient to establish the felony murder (robbery) charge. However, recent possession of stolen property (the rings) is competent and relevant evidence upon the issue of guilt. *State v. Brown*, 285 N.W.2d 848, 851 (S.D.1979). In fact, mere possession of stolen property is sufficient to sustain a robbery conviction. *State v. Patman*, 189 N.W.2d 620, 622 (Iowa 1971); *People v. Gordon*, 60 Mich.App. 412, 231 N.W.2d 409, 412 (1975). Here, Owens was in possession of Ross' rings, and there was an abrasion on one of her fingers from which a ring was taken. This evidence, together with Ross' death, was sufficient to permit the jury to consider the charge of robbery by the threat of force or fear of immediate injury.

[¶ 99.] Owens finally argues that there was insufficient evidence to submit the charge of felony murder (in the course of rape or attempted rape). However, the victim was naked from the waist down and there was evidence of abrasions on each side of the entrance to her vagina. Although the abrasion testimony was disputed, Owens admitted having sexual intercourse with Ross. The physical evidence, along with Owens' admissions, were sufficient to submit this charge to the jury.

[¶ 100.] **11. Whether the trial court should have granted Owens' motion for a mistrial.**

[¶ 101.] The trial court's denial of a motion for mistrial is reviewed under the abuse of discretion standard. *State v. Winckler*, 260 N.W.2d 356, 368 (S.D.1977).

[¶ 102.] Owens argues that the prosecutor acted improperly by using the word "murder" while questioning a witness. Owens also objected to testimony that the

videotapes had been edited. Owens contends these two occurrences, together with the pre-trial publicity and the trial court's other rulings, called into question the fundamental fairness of the proceedings. We disagree.

[¶ 103.] During the trial, one of the state's attorneys asked a detective whether he was familiar with the scene "where the murder occurred." The trial court found that the reference to "murder" was just a passing comment. In addition, the trial court gave the jury a cautionary instruction. In its admonition, the trial court reiterated its preliminary instructions that the lawyers' questions were not evidence; that the jury should not consider anything that the lawyers said as evidence; that the lawyers could not express opinions; and that the comments of the deputy state's attorney should be disregarded. This cautionary instruction was clearly adequate to cure any possible prejudice that may have resulted.

[¶ 104.] The evidence of tape editing was introduced to explain why there was a "flick" of no tape when the videotape was played. A detective explained that either the VCR had to be stopped or there were edits in the video. After reviewing the video testimony, the trial court observed that there was no unfair prejudice to Owens. The trial court noted that most people would probably "figure out" that there was some editing of the tapes just by watching them. We find that the trial court was correct in its assessment and that no prejudice resulted to Owens from any such editing.

[¶ 105.] We have found no prejudicial error in the trial court's other rulings. Therefore, we find no cumulative error.

[¶ 106.] Affirmed.

[¶ 107.] AMUNDSON, KONENKAMP, and GILBERTSON, Justices, concur.

[¶ 108.] SABERS, Acting Chief Justice, concurs in result.

[¶ 109.] MILLER, Retired Chief Justice, was a member of the Court at the time this action was submitted, but was disqualified and did not participate.

[¶ 110.] ZINTER, who was a Circuit Court Judge at the time this case was submitted, for MILLER, Retired Chief Justice, disqualified.

SABERS, Justice (concurring in result).

[¶ 111.] I concur in result, but write specially on Issue 6 to point out the deceit and trickery used by the interrogating detective. The majority opinion concludes that Owens had no objective or subjective expectation of privacy in the phone call to his mother. While it may be true that Owens discovered that he was being taped and that any admissions he made thereafter were not protected, the detective clearly engaged in deceit and trickery in getting him to call his mother and in taping the conversation, contrary to his prior assurances.

[¶ 112.] The actions of this detective cross the line of permissible interrogation. See *Stanga*, 2000 SD 129 at ¶ 25, 617 N.W.2d at 492 (Sabers, J., concurring specially). The detective first assured Owens that he was not recording or taping their conversation. Early on in the September 4, 1999 interview, Owens said to the detective: "You ain't got no tape recorder or nothin on ya do ya?" The detective said no and even lifted up his shirt to prove to Owens that he was not wired.

[¶ 113.] The detective then played on Owens' emotions and persuaded him to call his mother and confess his actions. The detective asked Owens: "If I were you, you want to know what I would do?" He then stated that he would call his mother because "she [was] going to hear about

this one way or another and I think she should hear it from you." The detective also made the following comments to Owens during the course of the interview:

Now you've got to decide how you want to deal with it. [Regardless] and let me tell you, *this is just between us, I mean man to man,* [regardless] on what you decide to tell me, you need to tell your mom before she finds out some other way. Okay? And you told me that you loved your mother. I know from experience of doing this job, let her know first, before somebody calls her and says "Your son really [ ] up and he is in big trouble." You know. You've got to understand that your family's never gonna, you know, your mom is still going to love you. *I want you personally to contact your mother.* Let her hear it from you. Don't let her hear it from somebody else. She deserves that much.

(emphasis added). As indicated, the detective clearly used deceit and played on Owens' emotions in an attempt to elicit a confession from Owens knowing it was being recorded.

[¶ 114.] In *State v. Dickey,* Justice Henderson warned:

I vote hereby to affirm this conviction but with a singular warning to the Sioux Falls Detective Bureau that there is a limit to which it can proceed, in order to obtain incriminating statements. I truly hope that this affirmance does not spawn further similar practices.

459 N.W.2d 445, 450 (S.D.1990) (Henderson, J., concurring specially). It is readily apparent that this officer of the Sioux Falls Detective Bureau has not heeded this warning.

[¶ 115.] In *State v. Oltmanns,* this Court affirmed the suppression of incrimi-

nating statements obtained through coercion. 519 N.W.2d 602, 606 (S.D.1994). *See also Stanga,* 2000 SD 129 at ¶ 1, 617 N.W.2d at 487 (holding that admission of an improperly obtained confession was harmless error). "Apparently, the trampling of a suspect's rights is of little concern to some members of law enforcement as long as a conviction will be upheld." *Stanga,* 2000 SD 129 at ¶ 26, 617 N.W.2d at 492 (Sabers, J., concurring specially). "Maybe they will persist in their present practice. If so, it won't be long before the results necessarily required in *Oltmanns* will revisit them." *Darby,* 1996 SD 127 at ¶ 52, 556 N.W.2d at 323 (Sabers, J., dissenting).[9]

---

9. There are many ways to obtain proper evidence against such monstrous acts as this. The use of trickery and deceit should not be principally relied upon to produce proper evidence. I write to encourage the use of the right ways so that, in the future, such monstrous acts as this will not go unpunished.